DAVIS, Chief Justice.
[¶1] Brent Wall was convicted of one count of first degree sexual assault of a minor. On appeal he claims that his right to be present at every stage of the trial was violated and that he was denied effective assistance of counsel. We find no reversible error and affirm.
ISSUES
[¶2] Mr. Wall presents two issues on appeal, which we restate as:
1. Did the district court commit reversible error when it responded to a juror note expressing confusion over DNA testimony without informing either party of the juror note and the court's response to it?
2. Was Mr. Wall's right to effective assistance of counsel denied: a) by trial counsel's conflict of interest; and b) when trial counsel did not adequately pursue a theory of intentional secondary DNA transfer?
*520 FACTS
[¶3] MW is the biological daughter of Sandra Bell-Wall and Brent Wall, the defendant in this case. Ms. Bell-Wall and Mr. Wall divorced in 2000, and Ms. Bell-Wall was given primary custody of MW, who was then about two, and her three-year-old sister CW. MW lived with her mother, sister, and half-brother in Urie, Wyoming, until December 2012.
[¶4] In 2012, MW was fourteen and had engaged in a number of troubling behaviors, including the use of fake social media profiles to lure classmates into conversations (also known as catfishing), sexually explicit conversations, falsely accusing family members of hurting her, committing self-harm by cutting her arms and torso, and generally being rebellious. When MW threatened to commit suicide, MW, her mother, and her father and stepmother, Arlee Wall, met with a counselor. It was decided that MW would move to Evanston, Wyoming to live with her father and stepmother and their two younger children.
[¶5] After MW moved in with her father and stepmother, her behavioral issues abated. In the fall of 2014, however, when she was sixteen years old, she wrecked her car, and after that her grades dropped and her troubling behaviors resurfaced. In early 2015, her grades were continuing to drop, and she had a boyfriend and best friend that her stepmother believed were negative influences. She began catfishing again, and she included in one of her profiles a fake obituary for her little sister. After her own electronic devices were taken from her, she stole electronic devices from her father and stepmother to use for catfishing, and when she was confronted with the theft, she first blamed her young half-sister and then destroyed the devices. In February, she altered and attempted to cash two checks written by her stepmother to her school for lunches.
[¶6] As discipline for these behaviors, MW had her activities and privileges restricted, and she was required to do chores to earn enough money to pay for the destroyed electronic devices. She was also homeschooled and restricted to her bedroom when not performing chores. All items were removed from her bedroom except her bed, a blanket, a desk, and a bible. She was required to wear shorts and a tank top so her father and stepmother could see if she was cutting herself.
[¶7] On March 1, 2015, MW's biological mother and sister came for a visit that lasted until about 1:30 that afternoon. After the visit, Ms. Bell-Wall expressed concern that MW seemed sad, and Mr. Wall assured her that MW's restrictions would soon be lifted. Later that afternoon, at about 2:30 p.m., MW's stepmother left to run errands. She arrived back home at about 4:00 and testified that the following then occurred:
Q. Now, when you got back, did you have a conversation with [MW]?
A. I did.
Q. And do you recall that?
A. I do.
Q. And what was that conversation?
A. I was hugging her.
She was crying. I thought she was crying because of the punishment.
I told her, "It's almost over. I know it's hard."
And she says, "You don't know how hard it is."
And I told her, "I do."
And then she told me, "While you were gone, dad made me give him a blowjob."
Q. And how did you react to that?
A. I was shocked that she could even say that.
I stepped back and I looked at her. And she said, "He did. He said you wouldn't believe me, but he did it and I can prove it."
Q. And what did you do?
A. I just - I shook my head and I grabbed a load of groceries and I went in the house.
Brent was sitting on the couch with the two kids when I walked in. And then I went back out for more groceries. She -
Q. And did [MW] bring groceries in or not?
A. Well, she was waiting for me at the car.
*521 Q. And then did you have any more conversation?
A. Yeah. She - she told me that, "He blew it in my mouth and I can prove it."
And I told her, "The mouth cleans itself. Don't you know that?"
And she goes, "But it's there. I haven't ate or drank anything since he did it."
And, I just - I shook my head, and she grabbed a load and followed me into the house.
And Brent asked me what was going on. He could tell that I was angry on my first trip.
And I told him - I just shook my head when he asked me. And I looked at [MK] and I says, "Tell him."
And she gave him a play by play. She told him everything that he had done.
And by that time, it had turned into a second blowjob, in the garage.
And I asked her, I says, "Why are you giving him a play by play? Wasn't he there?"
[¶8] Mr. Wall then called Ms. Bell-Wall, informed her of what MW was saying, and told her to come and get MW. Ms. Bell-Wall testified that she did not immediately believe MW's allegations, and so when she picked her up, she did not take her to the hospital. She instead bought her a bottle of water and a Dr. Pepper and returned to Mountain View. Ms. Bell-Wall eventually decided to take MW to the hospital in Evanston, and they arrived there at about 10:20 the evening of March 1st.
[¶9] The hospital contacted law enforcement, and Sergeant Randall Chandler of the Uinta County Sheriff's Office responded and took MW's statement, which he recorded. MW reported that she was doing chores in the garage when her father came into the garage and told her to retrieve a battery charger from his bedroom so he could return it to the garage shelf where it belonged. When she went to the bedroom, her father followed her and asked if she was ready to hear what she had to do to have her restrictions lifted. MW reported that when she said yes, the following occurred:
And so he pulls out this piece of paper and he says, "I wrote them down."
And I made a joke. And I was, like, "Hah. You took notes?"
And he said, "Yeah."
And then he listed them off. One of them said, "Your grades have to be average or better."
And I said, "Okay."
And then he said, "The garage will be finished."
And I said, "Okay."
And then he said, "And you will look in the mirror that I have in my bedroom, and you will find something that you like about yourself every day. Not just that you like, but that you find sexy."
And I said, "Okay."
And then he folded the piece of paper up and he put it in his pocket again, and he said, "And this last one is going to be hard for you and for me. You can think of it as a punishment, or you can not think of it as a punishment. You can think of it as a ... how to please a man in the right way for the rest of your life."
He said, "From this day forward, you are my sex slave."
[¶10] MW reported Mr. Wall thereafter forced her to remove her clothing and perform oral sex on him. She also reported that while they were in the bedroom, he vaginally penetrated her with a glass dildo and anally penetrated her with his penis. He then ejaculated into her mouth and gave her wipes with instructions to clean herself up and return to the garage. MW reported that after she returned to the garage and resumed her work, Mr. Wall came into the garage and again forced her to perform oral sex on him until he ejaculated.
[¶11] MW reported that she experienced pain and bleeding from the anal intercourse, that ejaculate dripped onto the bedroom floor, and that when ejaculate got on her hand in the garage she wiped it on her pants. She also reported that during oral sex she observed an ingrown hair next to Mr. Wall's penis.
*522 [¶12] After her interview with Sergeant Chandler, MW underwent a sexual assault examination. The physical examination of MW revealed no labial, vaginal, or anal injuries. Oral, labial, vaginal, and anal swabs were taken and provided to law enforcement, along with MW's clothing.
[¶13] Deputy James Schmidt of the Uinta County Sheriff's Office took over as lead investigator of MW's charges after Sergeant Chandler's initial interview of her. On March 2, 2015, he obtained a search warrant and with another officer searched Mr. Wall's residence. During that search, they seized samples from the master bedroom carpet, a couple of tubes of personal lubricant, and two glass dildos. They took photos of the bed and a nightstand and its contents, and they also took a photo of Mr. Wall's groin area, which showed an ingrown hair. Later in March, they returned with a second search warrant for Mr. Wall's DNA, which they obtained using a buccal swab.
[¶14] The items and samples obtained from Mr. Wall, his home, and MW were sent to the Wyoming State Crime Lab for testing. The crime lab generally performs different types of testing including both serology testing, which is testing for bodily fluids such as blood, semen, saliva, or urine, and DNA testing. The DNA testing it performs consists of two types, Y-STR (Y chromosome-short tandem repeat profile) and autosomal testing. Christina Buettner, the lab's DNA technical leader, testified that autosomal DNA is "the typical total human DNA that you think of when you hear about DNA analysis." As to Y-STR testing, she testified:
A. We perform a quantitation step that tells us how much DNA is present in a sample. And part of that step also tells us how much male DNA is present in the sample.
If we have a sample that has a very low amount of male DNA in comparison to a high amount of total DNA, so probably a lot of female DNA is present, we will use Y-STR technology on that to target the small amount of male DNA that's present.
Q. Why would that be an effective mechanism in sexual assault cases?
A. In sexual assault cases - in typical sexual assault cases, where the victim is female and typically a suspect is male, there's generally a large amount of victim DNA, especially on intimate samples like vaginal swabs or samples taken directly from the victim's body, in relation to a small amount of male DNA from a perpetrator.
[¶15] The lab performed autosomal testing on the glass dildos obtained from Mr. Wall's residence. That testing found that MW's DNA was not consistent with the DNA found on the items and excluded her as a DNA contributor, meaning her DNA was not present on either dildo.
[¶16] When it tested the oral, labial, vaginal, and anal swabs for DNA, the lab began by testing the samples for their ratio of male DNA to total human DNA to determine whether autosomal or Y-STR testing would be appropriate. That ratio testing showed no male DNA in the vaginal or anal samples, and therefore no further analysis was performed on those samples. The ratio testing on the oral swab showed a ratio of one part male for every one hundred parts human DNA, and the testing on the labial swab showed one part male for every 28,000 parts human DNA. Because of the small amount of male DNA present, the lab performed Y-STR testing on the oral and labial samples.
[¶17] The Y-STR testing on the oral sample yielded a DNA profile that was consistent with Mr. Wall's profile. The lab also considered the statistical rarity of the DNA profile obtained, and found that it was estimated to occur in one in every 1,190 individuals. The Y-STR testing on the labial sample produced only a partial profile, which identified only two of twenty-seven locations on the Y-chromosome. That partial profile was consistent with Mr. Wall's DNA profile but was also quite common and was estimated to occur in one in every fifteen individuals. Ms. Buettner explained:
A. A partial DNA sample or partial DNA profile is when we obtain a pretty weak result.
So we - we test for 20 something different locations on the Y chromosome.
*523 And a full profile would be a result at all of those locations. A partial profile is when we obtain results at less than seven of those locations.
So very little information is present.
Q. For the secondary identification of [the labial sample], then, with the partial, do you have a cut-off as to what is acceptable for reporting with the Wyoming State Crime Lab?
A. We don't have a cut-off for reporting. We just simply perform the statistical analysis and assign a weight to that match.
So typically, if we have less information, the statistics are much more common in the population than we would see for a full profile.
[¶18] In addition to the lab's DNA testing on the oral and labial swabs, it performed serology testing. The results for both items were negative for the presence of semen. The lab also performed serology testing on the underwear and pants obtained from MW at the hospital, and the results for both of those items were also negative.
[¶19] On May 2, 2016, the State filed an information charging Mr. Wall with four counts of first degree sexual abuse of a minor: Count I sexual intrusion by fellatio; Count II sexual intrusion with a dildo; Count III sexual intrusion by anal intercourse; and Count IV sexual intrusion by fellatio. Mr. Wall was appointed a public defender and pled not guilty to the charges.
[¶20] Before trial, Mr. Wall's trial counsel, who was employed by the Public Defender's Office, requested approval from his superiors for funds to retain a DNA expert to testify as to the reliability of the crime lab's Y-STR DNA findings. Trial counsel's request was denied, and he was instructed to instead challenge the Y-STR findings through cross-examination of the State's crime lab witnesses. Trial counsel then retained an expert to help prepare his cross-examination, but not to testify.
[¶21] The case went to jury trial on June 6, 2017. After the State rested, Mr. Wall moved for a directed verdict on all four counts, and the district court reserved decision on that motion. Mr. Wall then called two witnesses, MW's older half-brother, Travis Bell, and MW's stepmother, Arlee Wall. On June 9, 2017, the jury returned a verdict of guilty on Count I (fellatio) and not guilty on Count IV (fellatio). The jury was unable to reach a verdict on Counts II and III.
[¶22] Mr. Wall renewed his motion for judgment of acquittal on Counts I through III, and the district court set a hearing on that motion and any other motion related to the mixed verdict. On June 15, 2017, prior to the motions hearing, the State moved to dismiss Counts II and III for reasons of judicial efficiency and economy. In making its motion, the State observed that it "files this Motion with knowledge that Double Jeopardy may preclude any filing of future charges related to these specific facts and elements as contained in Counts II and III." Mr. Wall filed a response arguing that the dismissal must be with prejudice and at the same time filed a motion for a mistrial on Counts I through III.
[¶23] On June 27, 2017, the district court held a combined motions and sentencing hearing. On July 14, 2017, it entered an order dismissing Counts II and III with prejudice, and in the alternative granting Mr. Wall's motion for judgment of acquittal on those counts. The order denied Mr. Wall's motion for a mistrial on Counts I through III and also denied his motion for judgment of acquittal on Count I. On that same date, the court sentenced Mr. Wall to a prison term of four to eight years for his conviction on Count I. Mr. Wall filed a timely notice of appeal to this Court.
[¶24] On December 18, 2017, Mr. Wall filed a W.R.A.P. 21 motion for a new trial based on ineffective assistance of counsel, and this Court thereafter entered an order staying the appeal until the district court ruled on the new trial motion. On March 20, 2018, the district court held an evidentiary hearing, and on May 1, 2018, it issued its findings of fact and order denying Mr. Wall's motion for a new trial. Mr. Wall thereafter filed a notice of appeal, and this Court entered an order consolidating his appeals.
*524 DISCUSSION
I. District Court's Ex Parte Contact with Juror
[¶25] At just after 4:00 p.m. on the second day of trial, the State called Christine Buettner, the crime lab's DNA technical leader, as a witness. During direct examination, Ms. Buettner testified:
Q. And we're using terms - or I'm using terms of "consistent" and you've stated "excluded".
Can you define "consistent" to the Jury as you use it in your practice at the Wyoming State Crime Lab?
A. "Consistent with", or we can also call it "cannot be excluded", is when someone's DNA profile is matching up with all of the numbers in the DNA profile from the evidence.
"Not consistent" is meaning that there are differences in the two DNA profiles that could only be explained by the profiles being from different people.
Q. And what does "excluded" mean?
A. "Excluded" is the same as "not consistent".
[¶26] The State concluded its direct examination of Ms. Buettner at 5:00 that evening. The district court then recessed for the evening and instructed the jury:
Ladies and Gentlemen of the Jury, we're going to recess until tomorrow morning. We'll start up again at 9:00 o'clock.
I'm going to summarize for you, but I'm going to remind you of both Instructions 7A and 7B. The important part I'm going to summarize is off of Instruction 7A. Keep an open mind. The trial's not yet done. You only get to reach your decision during your deliberations.
You don't deliberate until all of the evidence is in and you've heard closing arguments of Counsel, my instructions, and you've been able to interchange the views with all of the other Members of the Jury.
Second, don't discuss the case amongst yourself or anyone else, including your family, friends, or anybody else involved in the trial. Don't permit anybody else to talk about the case in your presence, and if anybody does so, please report it to the bailiff as soon as you're able to.
Third, don't converse, whether in or out of the courtroom, with any of the parties or witnesses.
And, fourth, don't read anything about the case and don't do any research on social media or anything. You need to make a decision based solely upon what it is that happens here in the courtroom and the evidence and the instructions.
And with that in mind, Ladies and Gentlemen of the Jury, you'll be excused; and we'll see you back here tomorrow morning at 9:00 a.m.
[¶27] The next morning at 8:58 a.m. the district court placed the following on the record:
THE COURT: I'm on the record in chambers, alone. There is no other person besides the Court Reporter present with me.
The Court, this morning, received a handwritten note from the bailiff, and the handwritten note states as follows:
"Further clarification on terms, quote 'consistent', end quote, and, quote, 'excluded', end quote, in terms of DNA testing is requested. [Juror name omitted]."
The Court has intentionally not brought Counsel in because such a question from a juror, I believe, would alert the attorney or attorneys of that concern; and the Court is putting on the record that I am responding with a photocopy of Instruction 3 that has already been given to the Jurors. And that instruction reads as follows:
"Jurors are not permitted to ask questions of witnesses or of the attorneys; however, if you are unable to hear what the Court, an attorney, or a witness is saying, please raise your hand and the Court will see that the situation is corrected."
The Court is doing that in order to protect the integrity of the separation between the Jury and the attorneys. That concludes this entry that is done outside of the presence of any of the other attorneys or parties.
[¶28] Mr. Wall contends that this ex parte communication with a juror violated his right to be present at every stage of the trial and *525 was reversible error. Although we agree that the district court erred in having this ex parte contact, we conclude the error was harmless and does not warrant reversal.
A. Standard of Review
[¶29] The question of whether a defendant had the right to be present at a particular stage of trial is an issue of law subject to de novo review. DeMillard v. State , 2008 WY 93, ¶ 8, 190 P.3d 128, 130 (Wyo. 2008) (citing Seeley v. State , 959 P.2d 170, 175 (Wyo. 1998) ). A violation of that right, "even though of constitutional proportion, is subject to a harmless error analysis." Seeley , 959 P.2d at 178 (citing United States v. Gomez , 67 F.3d 1515, 1528 (10th Cir. 1995) ). To find the error harmless, this Court "must be able to declare its belief that the error was harmless beyond a reasonable doubt." Seeley , 959 P.2d at 178 (citing Price v. State , 807 P.2d 909, 917 (Wyo. 1991) (Cardine, J., specially concurring) ).
B. Discussion
[¶30] A defendant's right to be present at every stage of his trial is codified at Wyo. Stat. Ann. § 7-11-202 and W.R.Cr.P. 43(a) but arises from both the federal and Wyoming constitutions.
A criminal defendant has the right to be present during every critical stage of his criminal proceeding. There are numerous federal and Wyoming guaranties of this right. "The Sixth Amendment and the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution guarantee an accused the right to be present during every stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." Skinner v. State , 2001 WY 102, ¶ 20, 33 P.3d 758, 765 (Wyo. 2001). Article 1, § 10 of the Wyoming Constitution"is even more explicit in its guarantee to an accused of the right of presence at trial." Maupin v. State , 694 P.2d 720, 722 (Wyo. 1985). That provision states: "In all criminal prosecutions the accused shall have the right to defend in person...." Wyo. Const., art. 1, § 10. " 'The right to be present at trial stems in part from the fact that by his physical presence the defendant can hear and see the proceedings, can be seen by the jury, and can participate in the presentation of his rights.' " Skinner , ¶ 21, 33 P.3d at 765, quoting Bustamante v. Eyman , 456 F.2d 269, 274 (9th Cir. 1972). However, the "defendant's presence is not required when it 'would be useless, or the benefit but a shadow.' " Seeley , 959 P.2d at 177, quoting Snyder v. Com. of Mass. , 291 U.S. 97, 106-07, 54 S.Ct. 330, 332-33, 78 L.Ed. 674 (1934).
DeMillard , ¶ 9, 190 P.3d at 130.
[¶31] "Jury instruction is generally held to be a point in the criminal proceeding which warrants the presence of the defendant," and we have recognized that answering a jury's or juror's question is the equivalent of providing a jury instruction. Daves v. State , 2011 WY 47, ¶ 24, 249 P.3d 250, 258 (Wyo. 2011) (quoting Seeley , 959 P.2d at 177 ). An exception to the requirement of the defendant's presence exists, however, if the court's communication with the juror does no more than deliver an administrative directive. Seeley , 959 P.2d at 178.
The trial court's explanation did not instruct the jury on what the law is or on how to apply the law to the evidence. Nor did it instruct the jury on how to conduct itself. It merely gave the jury collateral information that did not affect its deliberation. Accordingly, the answer to the jury's question ... was an administrative direction.
Seeley , 959 P.2d at 178 (quoting Acree v. Minolta Corp. , 748 F.2d 1382, 1385 (10th Cir. 1984) ).
[¶32] The State concedes that the district court response to the juror note instructed her on how she was to conduct herself as a juror and thus went beyond an administrative directive. We agree. The court's response to the juror's note was tantamount to giving a jury instruction in Mr. Wall's absence, and the court thus erred. Although we appreciate the court's concern that counsel should not be privy to a juror's views on evidence before a verdict is reached, such concerns do not obviate a defendant's right to be present. See 3B Charles Alan Wright et *526 al., Fed. Prac. & Proc. Crim . § 725 (4th ed.) (Sept. 2018 update) (noting that prohibited communications between a court and jury often occur under difficult circumstances); see also United States v. Collins , 665 F.3d 454, 462 (2nd Cir. 2012) (finding reversible error even where trial court's ex parte communication with juror was an understandable attempt to ease hostilities during deliberations). We are concerned not with the district court's reason for its error, but rather with whether the error prejudiced Mr. Wall or was harmless.
[¶33] The State bears the burden of showing that a violation of a defendant's right to be present was harmless beyond a reasonable doubt. Seeley , 959 P.2d at 178 (citing Chapman v. California , 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) ). In determining whether the error was harmless, we look to whether it created "any reasonable possibility of prejudice." Smith v. State , 959 P.2d 1193, 1196 (Wyo. 1998) (quoting Seeley , 959 P.2d at 178 ). Under the circumstances here, we are unable to find a reasonable possibility of prejudice, and we thus conclude the State has met its burden.
[¶34] The State contends that the district court's error was harmless because the instruction the court gave the juror was legally correct, was one that the parties had agreed upon, and was one that had already been given to the jury. We again agree. The instruction the district court gave in response to the juror question was a photocopy of the very same instruction it gave the jury before opening statements. It was a proper instruction that provided the juror with no new information and with no information that differed from what had already been given to all the jurors. Under these circumstances, we are simply unable to find "any reasonable possibility of prejudice." See Seeley , 959 P.2d at 178 (finding harmless error where instruction given in defendant's absence was accurate statement of the law and similar to jury's initial instructions); United States v. Carter , 973 F.2d 1509, 1515 (10th Cir. 1992) (finding harmless error where ex parte instruction was substantially identical to that given in presence of defendant and defense counsel).
[¶35] Mr. Wall acknowledges that the instruction given in response to the juror note was an accurate statement of law and identical to one of the initial jury instructions agreed upon by the parties. He nonetheless contends the court's response was prejudicial because the instruction was the wrong one under the circumstances. He argues the juror's note was clear evidence that the jury was prematurely deliberating and that had he been made aware of the note, he would have advocated for an instruction admonishing the jury not to discuss the evidence or deliberate until it had heard all the evidence. We find no support in the record for this claim of prejudice.
[¶36] First, nothing in the note itself suggests it is any more than one juror's question about a witness's testimony. Second, it is logistically unlikely that the juror's note was the product of premature jury deliberations. The State's direct examination of Ms. Buettner ended just seconds before 5:00, and the court immediately recessed and directed the jurors to return at 9:00 the following morning. Though the record does not show the precise time the court received the juror's note, it was sometime that morning before 9:00. That means any deliberations would have had to have occurred as the jurors were leaving for the evening and arriving the next day. It also means the deliberations would have occurred just after the court instructed the jurors not to deliberate and not to discuss the case, which is of course contrary to our presumption that jurors adhere to instructions. See Haskell v. State , 2018 WY 85, ¶ 41, 422 P.3d 955, 966 (Wyo. 2018) (quoting Moore v. State , 2013 WY 120, ¶ 17, 309 P.3d 1242, 1246 (Wyo. 2013) ) ("We presume that jurors follow the instructions the court gives them.").
[¶37] While it is the State that bears the burden of showing the district court's error was harmless, that burden does not include ruling out every scenario, however unlikely that scenario might be. We take the juror's note at face value and conclude that it reflects no more than a single juror's question about a witness's testimony. The district court erred in providing an ex parte response *527 to the note, but we conclude that the State met its burden of showing the error was harmless beyond a reasonable doubt, and we therefore find no reversible error.[1]
II. Ineffective Assistance of Counsel
A. Standard of Review and Governing Law
[¶38] An appeal of an ineffective assistance of counsel ruling presents mixed questions of law and fact. Miller v. State , 2018 WY 102, ¶ 13, 424 P.3d 1284, 1287 (Wyo. 2018) (quoting Worley v. State , 2017 WY 3, ¶ 9, 386 P.3d 765, 769 (Wyo. 2017) ). We review the district court's conclusions of law de novo and defer to its factual findings unless they are clearly erroneous. Id ."A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Miller , ¶ 13, 424 P.3d at 1287 (quoting Cowboy's LLC v. Schumacher , 2018 WY 61, ¶ 10, 419 P.3d 498, 501 (Wyo. 2018) ).
[¶39] To prevail on an ineffective assistance claim, a defendant must show that his trial counsel rendered constitutionally deficient performance and that absent that deficiency, a reasonable probability exists that he would have enjoyed a more favorable verdict. Larkins v. State , 2018 WY 122, ¶ 62, 429 P.3d 28, 43 (Wyo. 2018) (citing Strickland v. Washington , 466 U.S. 668, 687, 695, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674 (1984) ).
To show that trial counsel's performance was constitutionally inadequate, the defendant must demonstrate that the attorney's performance was substantially below that of a reasonably competent attorney. Bruckner v. State , 2018 WY 51, ¶ 15, 417 P.3d 178, 181-82 (Wyo. 2018). We "evaluate[ ] counsel under the circumstances existing at the time of the challenged act or omission and from the perspective available at the time of the challenged act or omission." Id . at ¶ 15, 417 P.3d at 181. Because a defendant must establish both prongs, a court can decide an ineffective assistance claim on the prejudice prong without considering the deficient performance prong. Strickland , 466 U.S. at 697, 104 S.Ct. at 2069.
Larkins , ¶ 62, 429 P.3d at 43-44.
B. Discussion
[¶40] Mr. Wall's Rule 21 motion set forth the grounds on which he based his ineffective assistance of counsel claim.[2]
3. ... [T]rial counsel alleges there were external forces that inhibited or prohibited him from representing Defendant in the best possible manner.
4. Defendant is requesting this Court hold a hearing so the Defendant may present evidence on whether the Public Defender administration interfered with trial counsel's ability to represent Defendant by convincing counsel's expert witness to change his opinion on whether the expert witness could help Defendant in this trial.
5. Defendant is also requesting this Court hold an evidentiary hearing on whether the Public Defender administration's actions pressured trial counsel to "back off" on his request for an expert.
6. Finally, Defendant is requesting this Court order an evidentiary hearing on what the expert could have testified to regarding the reliability of Y-STR, [and] the database used in this case for Y-STR testing ....
[¶41] At the Rule 21 evidentiary hearing, Mr. Wall presented the testimony of three witnesses: 1) trial counsel; 2) Mr. Wall's father, Jim Wall; and 3) DNA expert Dr. Greg Hampikian of the Idaho Innocence Project.
*528 Based on the testimony, the district court found that any external pressures on trial counsel were immaterial because trial counsel reasonably analyzed his options concerning an expert witness and made an appropriate decision based on his assessment. The court further found that no evidence had been presented that Y-STR testing is unreliable, and that trial counsel had effectively challenged the crime lab's database choice through cross-examination. Finally, the court allowed evidence on but rejected a claim that trial counsel did not adequately assert a defense that the male DNA found on MW could have been the result of an intentional secondary transfer.[3]
[¶42] On appeal, Mr. Wall has framed the grounds for his ineffective assistance claim as: 1) trial counsel was concerned that his employment with the Public Defender's Office would be terminated if he retained an expert to testify against the reliability of Y-STR testing and he therefore had a conflict of interest that undermined his effective representation of Mr. Wall; and 2) trial counsel did not adequately assert a defense of secondary DNA transfer. We will address the claims in that order.
1. Conflict of Interest
[¶43] Mr. Wall claims that trial counsel would have retained an expert to testify at trial but for his fear that the Public Defender's Office would terminate his employment if he did so. He contends this was a clear conflict of interest because trial counsel placed his own interest in continued employment over Mr. Wall's interest. He further contends he was prejudiced because an expert would have challenged the reliability of Y-STR testing and the crime lab's statistical findings.
[¶44] The right to effective assistance of counsel includes the correlative right that counsel be free from conflicts of interest. May v. State , 2003 WY 14, ¶ 40, 62 P.3d 574, 585 (Wyo. 2003) (citation omitted); see also Sorensen v. State , 6 P.3d 657, 663 (Wyo. 2000) ; King v. State , 810 P.2d 119, 123 (Wyo. 1991). Such a claim, however, changes our effective assistance analysis.
Strickland , 466 U.S. at 692, 104 S.Ct. at 2067 indicated the continuing vitality of the conflict of interest standard formulated in Cuyler [v. Sullivan] , 446 U.S. [335,] at 345-50, 100 S.Ct. [1708,] at 1716-19 [64 L.Ed.2d 333 (1980) ]. Under that standard, a defendant who raised no objection at trial must show that an actual conflict of interest adversely affected his lawyer's performance before prejudice is presumed.
To demonstrate a conflict of interest, the appellant may "demonstrate that some plausible alternative defense strategy or tactic might have been pursued ... [and] establish that the alternative defense was inherently in conflict with the attorney's other loyalties or interests." Brien v. United States , 695 F.2d 10, 15 (1st Cir.1982).
To demonstrate an adverse effect, the "defendant would only have to show that his attorney's conflict reduced his effectiveness." [ State v. ] Jenkins , [148 Ariz. 463,] 715 P.2d [716,] 720 [ (Ariz.1986) ]. "[A]dverse effect is a less burdensome requirement than prejudice." Id .
Sorensen , 6 P.3d at 663-64 (quoting King , 810 P.2d at 123 ) (alterations in original).
[¶45] Mr. Wall did not object before or during trial to trial counsel's alleged conflict of interest. His ineffective assistance claim therefore requires a showing that trial counsel had an actual conflict of interest and that the conflict adversely affected his performance. The district court of course did not state its findings in those terms because Mr. Wall did not frame his claim as a conflict of interest during the Rule 21 hearing. Nonetheless, the court made a finding that trial counsel decided to forgo expert testimony based on his evaluation of the case and not out of fear for his own employment. The record supports this finding, and we further *529 conclude that the record shows no conflict of interest on trial counsel's part.
[¶46] With respect to the alleged pressure to forgo expert testimony, trial counsel stated in an affidavit attached to Mr. Wall's Rule 21 motion, "I believe I was pressured into trying to handle this case without an expert and [it was] a mistake to proceed without one." At the Rule 21 hearing, however, trial counsel testified that he made the decision based on his own assessment that he had what he needed for trial.
Q. And in your representation of Mr. Wall, you did not let their declination of payment stop you from hiring this expert?
A. No. I went ahead and hired the expert myself because I - I felt I needed the expert regardless of what the - the director of the Public Defender's agency said and I got that expert to assist me.
Q. And the expert, the Bioinformat - informatics, I think is what it was called, they, apparently, for whatever reason, informed you there wasn't a contrary opinion that they could provide at trial, correct?
A. I - I don't know that I would necessarily agree with that. They - they gave me different clues and tips on what to deal with on cross-examination and how to approach your witness. So I can't say that - that they agreed with everything that the State said.
Q. Okay. And that's fair. They did assert, though, that they couldn't - that they did not believe that there was any value in having someone testify for you?
A. That's what - that's what they told me. That's what my expert told me.
Q. So in relation to matters, as I'm sure you'll recall, during the course of these proceedings, the Court asked you point blank if you wanted him to entertain a motion from you to order the Public Defender to engage Bioinformatics, correct?
A. Yes.
Q. And then from your testimony, ... it would be my understanding then, rather than - you essentially had already retained Bioinformatics yourself and your decision, really, was that you didn't believe it was necessary to cause conflict with your employment with the Public Defender's office at that time because you'd already done what you thought was necessary?
A. I had done what I thought was necessary. I thought by ordering the Public Defender to pay, it would jeopardize potentially - my employment was part of it but I already had in motion, I thought, what I needed for the trial.
[¶47] This is consistent with what occurred before trial. During a December 13, 2016 hearing on Mr. Wall's second motion to continue, the district court addressed both trial counsel and Mr. Wall concerning the court's willingness to appoint a defense expert.
Mr. Wall and [Trial Counsel], if there's any - any issue where you want to have an expert to consult with, that can assist you in cross-examination, that's something that I'm very supportive of and I'm going to protect. Add to it that even if it's not just for that purpose, you may actually find the need to have an attorney - or an expert that comes and testifies because I think I made this clear in my ruling on the motion hearing. Yeah, the evidence is admitted but it doesn't necessarily speak about the weight that the jury can or chooses to give that. [Trial Counsel] and Mr. Wall, if you come up with something that attacks that weight, whether it's through the protocols or something else, then I want you to be able to have that opportunity to present that.
[¶48] Trial counsel did not seek court appointment of an expert. During the pretrial conference, he explained this decision.
But the concern I had is if no one's going to pay for who I believe is a needed expert, I could always file a motion with the Court under Ake v. Oklahoma , saying that if there's a need for an expert, then the Court can decide whether or not the defendant is entitled to have the Government pay for that expert or not. After speaking with the Bioinformatics people, I decided that I probably didn't need to do that. It seemed like the information they were giving would be helpful, maybe not the ideal situation in my mind, but probably sufficient in light of the facts that we're addressing. So while I'd initially felt there *530 was a need for that expert, I have some ability of getting expert help and so I'm consulting with them on a regular basis for that help.
As far as getting an expert here to testify in our behalf, there's no funding for that. Our expert, basically, the technical researcher ... has indicated to me that she didn't feel, in consultation with their - their PhD who reviewed the case that there was a - there was any benefit for them to come over and testify, that they could provide me sufficient information to proceed with the trial.
But I think those matters - I don't know that there's anything else to do with it, but I think that it's important that that be part of the record because a lot of the delay we've had in bringing this case to trial was to give me the opportunity to obtain expert advice on this case. I have obtained the advice, but I've been frustrated not being able to have the expert that I initially thought I needed.
THE COURT: [Trial Counsel], I think you've said - and I want to make sure that I understand it clearly. You've considered the opportunity to file a motion for me to have a hearing on, and rule on, whether or not an expert should be granted to Mr. Wall; and even though this committee for the Public Defender's office has reviewed it and made a determination, you've found that motion to not be necessary at this time; is that correct?
[TRIAL COUNSEL]: I find it not to be necessary but part of it isn't necessarily all my feelings. Part of it is the necessity of the Public Defender, saying, "We're not going to pay for any expert. We're not going to pay for that." There is a factor there. But also in dealing with the expert that I have hired, that they indicated that we would be able to proceed without any prejudice to Mr. Wall in this case and they've been very helpful in providing background information.
[¶49] In addition to trial counsel's testimony and pretrial statements that he decided to forgo expert testimony based on his assessment of what was needed for the defense, trial counsel also clarified his concern with his employment during the Rule 21 hearing. He was not concerned with losing his job for personal reasons. He was concerned that if his employment were terminated, a different attorney appointed to this case may not share his opinion that the Y-STR testing should be challenged. This lack of concern for his personal employment is confirmed, we believe, by the fact that trial counsel resigned from the Public Defender's Office shortly after Mr. Wall's trial. Trial counsel explained:
... I went ahead and hired the expert myself, anyway, and so I had an expert. The expert said there wasn't any need to testify, so that matter was resolved. And it didn't seem like it was worth making it - it wasn't worth the $2,500 point to me to have the Public Defender be ordered to pay people and, perhaps, jeopardize my employment with them. I had intended on continuing employment with the Public Defender; but by the time we went to trial, I was - I was just so mad at how I was being treated regarding my cases with the Public Defender's office, I decided not to continue my employment with them.
[¶50] Nothing in the record suggests that at any point in the proceedings trial counsel placed his personal concerns over his client's concerns or that the two were in competition. On the contrary, trial counsel spent $2,500 of his own funds to work with an expert and was only concerned with his continued employment because of the effect a change in counsel might have on Mr. Wall's defense. The record thus supports the district court's conclusion that trial counsel made the decision to forgo expert testimony based on his assessment of the case needs, and it further demonstrates that trial counsel had no conflict of interest.
[¶51] Underlying Mr. Wall's conflict of interest claim is an implication that had trial counsel had sufficient funds and been unrestricted in his trial strategy, his preference would have been to present expert testimony. That claim is of course different from saying that trial counsel had a conflict of interest that motivated his decision. Framed in these terms, the claim returns us to our standard *531 ineffective assistance inquiry. As we have previously observed:
Much of the remand hearing evidence and Mr. Griggs' argument on appeal center on the problems his trial counsel may have had with obtaining funding through the State Public Defender's Office for his expert witness. He argues that the State Public Defender's Office's failure to adequately fund an expert witness to testify at trial or other court hearings amounted to deficient representation. We will not delve into the internal workings of the State Public Defender's Office. While trial counsel's requests for expert funding, the state office's responses to those requests, the timing of the communications, etc. may be interesting, our precedent places the focus upon whether defense counsel's actual actions or omissions violated Mr. Griggs' constitutional right to effective assistance of counsel.
Griggs v. State , 2016 WY 16, ¶ 42, 367 P.3d 1108, 1125-26 (Wyo. 2016) (citing Lower v. State , 786 P.2d 346, 349 (Wyo. 1990) ).
[¶52] Returning then to our standard inquiry, the questions are: 1) did trial counsel's failure to present expert testimony challenging Y-STR DNA testing amount to performance substantially below that of a reasonably competent attorney; and 2) does a reasonable probability exist that had expert testimony been presented, Mr. Wall would have enjoyed a more favorable verdict. See Larkins , ¶ 62, 429 P.3d at 43. The district court answered these questions in the negative, and we agree.
[¶53] We have held that the failure to present expert testimony is not in itself ineffective assistance of counsel.
A reasonably competent attorney may use an expert witness in a variety of ways, including as a consultant in areas of specialized knowledge, for review of the facts of a case, to formulate trial strategy, to develop questions for cross examination of the State's witnesses, as an expert witness at court hearings or trial, etc. An attorney is not necessarily ineffective because he decides that an expert's assistance in trial preparation is sufficient and that the expert's testimony at trial is not necessary. Other courts have specifically rejected ineffective assistance of counsel claims where defense counsel reasonably chose to use an expert to prepare to cross examine the government's witnesses rather than having the defense expert testify at trial. See , e.g. , Rice v. State , 292 Ga. 191, 733 S.E.2d 755, 772 (2012) ; Brown v. United States , 384 A.2d 647, 649 (D.C.Ct.App.1978) (consultation with expert for cross examination in lieu of calling expert to testify was not ineffective assistance of counsel). The task of the court in reviewing the adequacy of defense counsel's representation will be to determine whether defense counsel reasonably analyzed the options and decided on an appropriate course of action. See , e.g. , Cooper [v. State , 2014 WY 36, 319 P.3d 914 (Wyo. 2014) ], supra ; Lopez v. State , 2004 WY 28, 86 P.3d 851 (Wyo. 2004).
Griggs , ¶ 39, 367 P.3d at 1125.
[¶54] In this case, trial counsel consulted with attorneys in his own office, and with his expert, concerning the need for expert testimony to challenge the Y-STR testing. All concurred that expert testimony was not necessary in this case and that Mr. Wall's defense would not be prejudiced by challenging the testing through cross-examination. Mr. Wall's only evidence to the contrary was trial counsel's opinion offered in support of the Rule 21 motion:
9. I contacted Bioinformatics and sent them a copy of the transcript from the Daubert hearing. The expert from Bioinformatics contacted me and said I think we can help you. The expert stated the database used in the testing in this case was one reason it should not be used.
* * * *
15. I believe it was a mistake and not in my client's best interest to rely on cross-examination to explain the Y-STR DNA. Cross-examination brought out answers that were self-serving to the expert. A defense expert could have fully explained why this type of testing is not reliable and particularly why the testing in this case was not reliable.
*532 [¶55] The record does not support trial counsel's change of heart. First, concerning the crime lab's database choice for its statistical calculations, Mr. Wall presented no expert opinion that the lab's choice was flawed. Dr. Hampikian testified:
Q. And similarly, although your database provided different information, you, again, would not provide in this case an expert opinion related to the fact that the scientific - the - sorry. Let me restate that. In relation to this case, for the oral swab, your testimony was that your database provided somewhat significant different numbers, correct?
A. Yes, but I - you know, I think - I don't want to leave the impression that they're drastically different, even though we have 1 in 699 and they have 1 in 1,100 something. I think these are both reasonable, scientific ways of doing it.
Q. So you would not disagree with the statistical information provided by the Crime Lab in this case?
A. No, I would not.
[¶56] Dr. Hampikian also testified that he did not find any problems with the crime lab procedures used in handling the evidence, and he agreed that Y-STR testing was the proper test under the circumstances.
Q. And from my understanding of your testimony previously today, you would agree with Ms. Buettner that the appropriate DNA testing, then, would be the Y short tandem repeat because of the small amount of male DNA?
A. That's correct.
Q. And so the Wyoming State Crime Lab would have utilized the appropriate testing in this case?
A. Yes, I agree.
[¶57] "When an ineffective assistance claim is based upon the failure to call an expert witness, the defendant must show an expert was available who would have testified consistently with his theory." Griggs , ¶ 38, 367 P.3d at 1124 (quoting Cooper v. State , 2014 WY 36, ¶ 22, 319 P.3d 914, 920 (Wyo. 2014) ). Dr. Hampikian offered no opinions critical of Y-STR testing in general or of the crime lab's testing in particular. Mr. Wall's claim thus fails.
[¶58] Additionally, trial counsel quite effectively cross-examined Christina Buettner, and through that examination obtained an even more favorable statistical frequency than would have been provided through expert testimony. Dr. Hampikian testified his choice of databases would have resulted in a finding that 1 in 699 individuals have the same DNA profile as that found on the oral swab. Ms. Buettner, using a different database, made a statistical finding that the DNA profile would occur 1 in 1,190 individuals. On cross-examination, however, Ms. Buettner conceded the calculation would change if a different, more tailored database were used.
Q. And that's when you testified that was 1 in 1,100, or something along that line; correct?
A. That's the total statistic, yes.
Q. Okay.
But actually, if you look at Caucasian, it's 1 in 500 and something?
A. Yes. 1 in 562.
Q. So, for a Caucasian male with that sort of makeup, whether it's dad, son, grandpa, Thomas Jefferson, it would probably be 1 in 500, not 1 in 1,100, wouldn't it?
A. 1 in 562.
[¶59] Trial counsel made the decision to forego expert testimony after consulting with his expert and with attorneys in his office and thus reasonably analyzed his options. That he chose an appropriate course is borne out by the results of his cross-examination and the Rule 21 record. We thus agree with the district court that Mr. Wall failed to show that trial counsel's performance was constitutionally deficient or that with expert testimony on Y-STR testing a reasonable probability exists that Mr. Wall would have enjoyed a more favorable verdict.
2. Secondary DNA Transfer
[¶60] In his second claim, Mr. Wall contends that trial counsel was ineffective because he did not adequately pursue a theory of intentional secondary DNA transfer. Mr. Wall's theory is that the amount of male DNA found on the oral and labial swabs is *533 consistent with secondary transfer and that MW knew how to obtain and plant DNA and had threatened to do so in the past. He argues counsel should have presented both expert testimony and the testimony of Mr. Wall's father to support this defense. We again find the district court's rejection of this claim supported by the record.
[¶61] Dr. Hampikian explained the difference between direct and secondary DNA transfer.
Q. Okay. So can you explain this secondary transfer?
A. Yeah. So, I mean, if I - you know, if someone were to stick their finger in my mouth, that would be a direct transfer to my - to my mouth from their finger. However, if I drank from their cup and got some of their DNA on my lip, say, which is not an unlikely scenario, then that would be a secondary transfer because it came from the cup. DNA transfer is inherent to the process. I mean, we swab things with a Q-tip like swab so that's transfer. So we expect DNA to transfer pretty - pretty readily. If we - if we have a direct transfer, it means from a person to the - the substrate or the person that is swabbed, directly from one person to whatever is being sampled.
[¶62] In support of his intentional secondary transfer theory, Mr. Wall points to additional Rule 21 testimony from Dr. Hampikian and from Jim Wall, Mr. Wall's father. Dr. Hampikian testified that the DNA ratios found on the oral and labial swabs, the labial being 28,000 parts human DNA to one part male DNA, and the oral being 100 parts human DNA to one part male DNA, were significant because of the small amount of male DNA present. He further testified that such ratios are consistent with secondary transfer. Jim Wall testified:
Q. Mr. Wall, have you ever gone camping with [MW]?
A. Yes.
Q. Okay. And during any of these camping trips did anything odd happen with [MW]?
A. Yes. We were hunting and we had taken everybody to the top of the ridge and I had to take the horses down to the bottom. And she didn't want to walk, so she went with me. We got down there and I started tying up horses and stuff and she said, "I want to go to camp." I says, "[MW], I can't take you to camp. I have people coming down here and I can't leave these horses or none of this stuff."
Q. Did she get upset with you because of that?
A. She got real upset and she says, "You don't want to make me mad."
Q. And why was that?
A. And I says, "Well, why's that?" She says, "You don't want to make me mad." So we went over and I was sitting there, smoking a cigarette.
Q. And what happened next?
A. And I always take and spit in my hand and put my cigarette out. That's so I never cause a fire. And I throwed it down on the ground. And she walked over, picked it up, held it up to me, and she says, "Do you realize I can get your DNA?" And it scared me to death.
Q. Why did it scare you?
A. Because I'm dumb. I don't know none of this.
Q. And did you consider that a threat?
A. Yes. From that day forward, I never walked through the door of my boy's house. If I went out there, we went to the garage. And if I wanted coffee or something, it was brought to me. I did not dare to even go in around her for fear of what she would do.
[¶63] Mr. Wall contends that had the expert testimony and Jim Wall's testimony been presented to the jury, the jury would have had an alternative explanation for the presence of Mr. Wall's DNA on the oral swab. With this alternative explanation, he argues, a reasonable probability exists that he would have been acquitted on Count I. Based on the record, we must disagree.
[¶64] From the trial record, it is apparent that, while trial counsel used cross-examination to establish the easy transferability of DNA and argued the potential for accidental secondary DNA transfer, he did not pursue, or perhaps even consider, a theory of intentional *534 DNA planting. This is confirmed by trial counsel's Rule 21 hearing testimony.
Q. Okay. And do you recall - or do you know Mr. Jim Wall?
A. Briefly, yeah.
Q. Okay. How do you know him?
A. Oh, just because he was Brent's dad.
Q. Okay. And do you recall Mr. Jim Wall telling you a story about camping with [MW]?
A. I don't. I don't recall that. I'm sorry.
Q. Okay. Well, do you recall him telling you that [MK] had actually said to him, "Do you know how easy I can get your DNA," in a threat to Mr. Jim Wall?
A. I - I do recall him raising that. I don't recall the context of it but I do recall him raising that - that matter with me.
Q. Okay. Did you consider calling Mr. Wall to the stand?
A. No, I didn't.
Q. And why not?
A. Because I thought the - the issue regarding the - the Y chromosome was - was pretty well standard. There were a number of people that I think Brent and I disagreed with that he wanted to call that I didn't; and most of those people had to do with her - her history of lying about everything. And when she testified, she pretty much admitted that she lied about everything, so it didn't seem like that was - was something I was going to pursue with those witnesses.
Q. Okay. And did you - did you consider questioning [MW] about whether or not she knew how to get DNA?
A. No. I don't think I ever considered that.
[¶65] While trial counsel explained why he did not want to use Jim Wall for purposes of impeaching MW's credibility, he did not offer a reason for not pursuing a defense theory of intentional DNA planting by MW. We need not, however, determine whether that omission amounted to deficient performance because we conclude the record does not support a finding that had the theory been pursued, a more favorable outcome was reasonably probable. See Larkins , ¶ 62, 429 P.3d at 43-44 ("[A] court can decide an ineffective assistance claim on the prejudice prong without considering the deficient performance prong.").
[¶66] First, while Dr. Hampikian testified that the oral swab was consistent with a secondary transfer of DNA, he also testified that it was consistent with the State's theory that the DNA became diluted by MW's drinking of fluids and the several-hour delay in having her mouth swabbed. Dr. Hampikian's testimony is therefore something of a wash. We also question the weight Jim Wall's testimony would have carried as his obvious bias would make his testimony vulnerable to impeachment.
[¶67] Additionally, the record contains no other evidence to buttress the DNA planting theory. MW testified at trial that she had been disciplined for smoking Mr. Wall's cigarette butts, but no date was provided for that incident. We do not know if on the date of MW's allegations, she had access to Mr. Wall's cigarette butts, or even if Mr. Wall still smoked. No evidence was offered at the Rule 21 hearing to answer this question or to support the theory that MW had access to cigarette butts or any other item of Mr. Wall's that she could use to plant his DNA. Based on the record before the district court, the theory of DNA planting was purely speculative.
[¶68] Finally, the DNA on the oral swab was not the only evidence corroborating MW's Count I allegation. MW reported and testified that she observed an ingrown hair near Mr. Wall's penis, and that observation was confirmed by a law enforcement photo and an officer's testimony. Also, MW testified that when she told her stepmother about Mr. Wall's written list of conditions, which she reported included the requirement that she be his sex slave, her stepmother tried to look in Mr. Wall's jacket pocket and he stopped her. Although MW's stepmother testified, she did not refute or address in any manner this allegation. The State emphasized both corroborating details in its closing argument. The prosecutor argued, "If that list wasn't there, then why didn't Mr. Wall allow Arlee to check his coat? That's something I would ask." She further argued:
*535 [MW], in her discussions with law enforcement, was able to identify that Mr. Wall had an ingrown hair, approximately lateral to his penis, on the left side of his groin. Why would a [16]-year-old child have any idea that her father had an ingrown hair on his groin?
[¶69] Against this evidence and MW's own testimony in which she had already admitted to numerous acts of dishonesty and manipulation, we are unable to conclude that had the theory of intentional DNA transfer been pursued, a reasonable probability exists that Mr. Wall would have received a more favorable verdict.
CONCLUSION
[¶70] The district court erred in issuing an ex parte instruction to a juror in response to a note received during trial, but the error was harmless and not grounds for reversal. We further conclude that the record supports the district court's ruling on Mr. Wall's W.R.A.P. 21 motion for a new trial. Affirmed.

We also note that even if an admonition against premature deliberation would have been in order, the district court gave such an instruction just before 10:30 that same morning when the court took a mid-morning break. That same instruction, or variations on it, was given ten times throughout the trial. We are satisfied the jury was adequately instructed on its obligation to refrain from discussing the case prematurely.

We have omitted the claim that expert testimony should have been presented to establish that Y-STR testing is appropriate only for exclusion of suspects and not for inclusion. The district court rejected the claim, and it has not been reasserted on appeal.

The district court noted that the secondary transfer claims were outside Mr. Wall's W.R.A.P. 21 motion, but it addressed them, explaining that "[i]n the interest of justice, to give the Defendant due process, and for judicial efficiency, the Court will consider these new issues." See W.R.A.P. 21(a) ("Any claims of ineffectiveness not made in the motion shall not be considered by the trial court unless the trial court determines that the interests of justice or judicial efficiency require the consideration of issues not specifically indicated in the motion.").