# IN THE SUPREME COURT, STATE OF WYOMING

# 2019 WY 130

OCTOBER TERM, A.D. 2019

December 27, 2019

MARK DANIEL BYERLY,

Appellant
(Defendant),

v.

THE STATE OF WYOMING,

Appellee
(Plaintiff).

S-18-0033, S-18-0034, S-18-0284,
S-18-0285, S-19-0088, S-19-0089

*Appeal from the District Court of Teton County*
*The Honorable Timothy C. Day, Judge*

*Representing Appellant:*
> Christopher Lundberg, Spitzer Law, PLLC, Victor, Idaho

*Representing Appellee:*
> Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Christyne M. Martens, Senior Assistant Attorney General; Russell Farr, Senior Assistant Attorney General. Argument by Mr. Farr.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

*DAVIS, C.J., delivers the opinion of the Court; BOOMGAARDEN, J., files a specially concurring opinion in which KAUTZ, J., joins.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**DAVIS**, **Chief Justice**.

[¶1]   A jury found Mark Byerly guilty of six offenses: aggravated assault and battery; domestic battery; strangulation of a household member; two counts of violating a protective order; and witness intimidation.  He asserts numerous errors on appeal, but finding no grounds for reversal, we affirm.

## ISSUES

[¶2]   Mr. Byerly presents six issues on appeal, which we restate as follows:

> 1)   Did the district court err in denying Mr. Byerly's W.R.Cr.P. 33 motion for a new trial based on the State's alleged failure to disclose exculpatory evidence?
>
> 2)   Did the district court err in denying Mr. Byerly's W.R.A.P. 21 motion for a new trial based on his several claims of ineffective assistance of counsel?
>
> 3)   Did the State commit prosecutorial misconduct by vouching for the credibility of the victim and by failing to correct false testimony?
>
> 4)   Did the district court err in joining charges against Mr. Byerly for trial?
>
> 5)   Did the district court err in denying Mr. Byerly's motion for a Daubert hearing on the testimony of the State's domestic violence expert?
>
> 6)   Did cumulative error warrant reversal of Mr. Byerly's conviction?

[¶3]   The State responds to those issues and presents the additional question of whether Mr. Byerly's appeal should be dismissed for failure to comply with the Wyoming Rules of Appellate Procedure.

## FACTS

[¶4]   Mark Byerly met Michele Pickerill in 2011, and they dated off and on until August 2013.  They began dating again in May of 2014, and they dated and lived together off and on until January 2016.  On January 13, 2016, Ms. Pickerill broke up with Mr. Byerly.  On January 19, she invited him over, and he stayed the night.  The next day, they texted back

1

and forth about getting together that evening for dinner, without alcohol, so they could discuss the future of their relationship.

[¶5]    That evening, a friend of Ms. Pickerill's invited her to join her and her husband for a drink to celebrate the friend's birthday.  She agreed and met them at a local bar where she drank beer and ate nachos.  While there, Ms. Pickerill received a text message from Mr. Byerly telling her where he was and asking her to join him.

> A.      . . . Mark texted and said, "I'm at The Moose, come over here."  So I did, that was about 6:30, quarter to 7:00.  When I went upstairs at The Moose all our ski friends were there, a group of guys.  I could pretty much tell right away that Mark had had several.
>
> Q.      Several?
>
> A.      Beers, you know.  After skiing, you know, four o'clock you start drinking.  It was 6:30, seven o'clock by then.  A mutual friend of ours bought me a beer and a shot because that's what they were doing.  Mark started to get a little agitated.  My friend Kim and Josh her boyfriend showed up.  She finished work at 7:00.
>
> Q.      I'm going to stop you and back you up a little bit.  Do you know what caused [him] to get agitated?
>
> A.      I don't recall what was said that started him getting mad at me.
>
> Q.      Okay.  Please continue.
>
> A.      Stood in the group of friends talking.  Mark was saying some pretty nasty things to me again.  I was like, "You know, we're not talking tonight.  We're not going to dinner.  I'm leaving.  We're done.  I don't need this."
>
> Was attempting to leave when he said, "No, you're not going anywhere."
>
> By then Kim and Josh had shown up.  Kim could tell by the look on my face that I wasn't happy.  Mark was standing to my left and he had his hand on my back, holding my shirt.  Kim looked at me and said, "Do you want to go?"

And I said, "Yeah."

And Mark in my ear said, "You're not fucking going anywhere."

So, Kim and Josh left. Like, we gave her an opportunity to leave and she's not going, we're out. They left. One by one all the ski buddies left. Mark at one point had me by my collar, shaking me, just the usual yelling, you know, stuff that he does. At one point I looked over his shoulder and saw the bartender and gave the bartender a look like could you help me out here. He looked the other way.

Finally Mark let go and I proceeded to leave. By the time I got downstairs and made it out the front door of The Moose I felt Mark grab my elbow. He walked me out the front door.

[¶6]    Mr. Byerly and Ms. Pickerill argued in the parking lot, and Mr. Byerly grabbed her by the collar again and shook her. Ms. Pickerill then saw four people walking through the parking lot some distance from them and yelled to them for help.

That really pissed him off so he put his hand over my mouth and spun me around real quick and from behind he walked me over to a snowbank and threw me down. I don't know if it was his knee, hand, what he had on my back, but he held me in the snowbank, I don't know, ten seconds. And I felt this is it, I want to go [sic] too far. He's probably going to fucking kill me now and my kids are going to be real upset with me. I didn't get out soon enough.

I thought he was going to kill me. When I tried to breathe I couldn't breathe anything but snow. The entire time my head was in the snowbank he's screaming, "You fucking bitch, you don't understand how much I fucking love you, Michele. You just don't know how much I fucking love you."

I thought you've got to be kidding me, you fucking love me and you're trying to kill me. He finally let go and I got up. He started walking to his truck and I started running the other way and turned around and said, "Don't you ever fucking come near me again," and ran.

[¶7]     Three days later, on January 23, 2016, Ms. Pickerill reported the January 20 incident to law enforcement.  On January 25, 2016, she completed an application for an order of protection against Mr. Byerly, and on February 9, 2016, following an evidentiary hearing, an order of protection was entered.  On July 8, 2016, the State filed a criminal information against Mr. Byerly, followed by an amended information on July 12, 2016.  As amended, the information charged Mr. Byerly with the following ten offenses, which we summarize as follows:

> **Count 1:  Domestic Battery.**  This charge was based on abuse that was alleged to have occurred on May 6, 2015.  Ms. Pickerill alleged that she met Mr. Byerly for a couple of beers, and then he came to her home and they argued.  She further alleged that during the argument, he tore her bed apart, threw things, and grabbed her by the wrists and shook her so hard that her head hit the floor ten to twelve times.
>
> **Count 2:  Property Destruction.**  This charge stemmed from the Count 1 incident and alleged damage to a lamp during the incident.
>
> **Count 3:  Domestic Battery.**  This charge was based on abuse that was alleged to have occurred on July 25, 2015.  Ms. Pickerill alleged that Mr. Byerly picked her up from paddle boarding, they went to dinner, and then got into an argument on the way home.  She further alleged that he pulled his truck into a parking area on Adams Canyon Road, and once out of the truck, he chased her around it, threw her belongings out and at her, and eventually started throwing rocks at her.
>
> **Count 4:  Domestic Battery.**  This charge was based on abuse that was alleged to have occurred on August 12, 2015.  Ms. Pickerill alleged that while she was having dinner with Mr. Byerly at a brewpub, they began to argue and he was kicked out of the restaurant.  She further alleged that after she had their food boxed and paid the bill, she went out to her vehicle and found Mr. Byerly waiting for her.  She alleged that he threw the food at her and threw her against the vehicle, causing her to hit her head.
>
> **Count 5:  Aggravated Assault and Battery.**  This charge was based on abuse that was alleged to have occurred on October 11, 2015.  Ms. Pickerill alleged that after she spent the day goose hunting with Mr. Byerly, they drank beer on the way home, and once home they got into an argument.  She further alleged that the argument escalated, and he threw her cell phone at her, and it hit her sloped bedroom ceiling.  She alleged that he then jumped on top of her, threw coconut oil all over her and her bedroom, and that while he was holding onto her and squeezing her face, she bit him.  She alleged that he responded by hitting her across the side of her head, which caused a perforated eardrum on her left side, a temporary loss of hearing, and persistent jaw pain.

4

**Count 6: Property Destruction.** This charge stemmed from the Count 5 incident and alleged damage to Ms. Pickerill's bedroom ceiling where the cellphone hit it, and damage to the carpet from the coconut oil.

**Count 7: Domestic Battery.** This charge was based on abuse that was alleged to have occurred on January 13, 2016. Ms. Pickerill claimed that on that evening, she and Mr. Byerly were at a brewpub with friends, and he offended her by kissing another woman. She further alleged that she left the brewpub and told him not to come to her home that evening, but he did anyway. She alleged that he came to her bedroom, where they argued, and he grabbed her by the wrists and shook her, which caused her pain.

**Count 8: Domestic Battery.** This count is based on the events of January 20, 2016 at the Mangy Moose.

**Count 9: Strangulation of a Household Member.** This count is also based on the events of January 20, 2016 at the Mangy Moose.

**Count 10: Violating an Order of Protection.** This count alleged that on or about April 5, 2016, Mr. Byerly violated the order of protection by indirectly communicating with Ms. Pickerill. Ms. Pickerill claimed that Mr. Byerly left boxes of items with his attorney that purportedly belonged to Ms. Pickerill, but instead contained items meant to indirectly communicate with her, including books with pages dog-eared and passages highlighted, a birthday card she had given him when they were together, two dirty sweatshirts she had given him when they were together, a couple of bottles of Coors Light, and a half-empty bottle of wine.

[¶8]   On December 12, 2016, while the above-summarized charges were pending, Tim Bohan, a mutual friend of Mr. Byerly and Ms. Pickerill, approached Ms. Pickerill at a brewpub where she was having a drink with a friend.

> A.     We sat down, Tim approached us. Kim was sitting to my right, Tim was between us, I on the left.
>
> And Tim said, "I've really been wanting to talk to you."
>
> And months prior to this – Tim is a mutual friend of Mark and mine. When this all went down Tim and I were discussing things one night, it really puts Tim in the middle. I said, "Tim, let's just have an understanding right now. You and I do not talk about Mark and I, okay? That way you can

remain friends with both of us. Just let's agree on that right now." And he agreed.

So that night when he approached us he said, "I'm just really torn. I don't know what to do. I had breakfast with Mark the other morning and he wants me to tell you something."

And I put my hands up and said, "Don't. No. Stop right there."

Q.    You literally put your hands up?

A.    I literally put my hands up and said, "Stop right there."

Q.    Did Ms. Trantham respond?

A.    She just kind of sat there watching going, "What? What?" I believe she said something like, Tim, you shouldn't, you shouldn't, referring to the restraining order.

Q.    Did – what did Mr. Bohan do next?

A.    He said, "Well, I've been sitting on this for a while and I've talked to other friends and everybody says I should leave it alone. But being your friend, Michele, I'm a little worried about what Mark's telling me."

Of course it got my curiosity up. I was like, "Really, we should just drop it."

He said, "No, I'm a little worried. Mark wants me to tell you, you'd better drop this case or else."

I said, "Or else what?"

And he said, "Well, he's convinced that you've tampered with the photos you presented of your arms. You've doctored them somehow. He's going to prove that you did that and when you finally do take the stand you're going to be charged with perjury and he doesn't want to see you go to jail."

[¶9]    Ms. Pickerill reported the incident to law enforcement, and Detective Chad Sachse of the Teton County Sheriff's Office interviewed Mr. Bohan. Mr. Bohan admitted

6

delivering the message to Ms. Pickerill as she described it, and he admitted that he did so at Mr. Byerly's request. On December 14, 2016, the State filed a second information against Mr. Byerly alleging one count of influencing, intimidating, or impeding a witness, and one count of violating an order of protection. Both counts were based on Mr. Bohan's message to Ms. Pickerill on December 12.

[¶10] On March 28, 2017, the State filed a motion to join the cases for trial, to which Mr. Byerly did not object.[1] On April 28, 2017, the district court entered an order joining the two cases for trial. On July 17, 2017, the joined cases went to trial, and on July 21, the case was submitted to the jury, and it returned its verdict. It found Mr. Byerly not guilty on six of the charges: Count 1 (May 6, 2015 Domestic Battery); Count 2 (May 6, 2015 Property Destruction); Count 3 (July 25, 2015 Domestic Battery); Count 4 (August 12, 2015 Domestic Battery); Count 6 (October 11, 2015 Property Destruction); and Count 7 (January 13, 2016 Domestic Battery). It found him guilty of the remaining six charges: Count 5 (October 11, 2015 Aggravated Assault and Battery); Count 8 (January 20, 2016 Domestic Battery); Count 9 (January 20, 2016 Strangulation of a Household Member); Count 10 (April 5, 2016 Violating an Order of Protection); Count 11 (December 12, 2016 Influencing, Intimidating, or Impeding Witnesses); and Count 12 (December 12, 2016 Violating an Order of Protection).

[¶11] On December 1, 2017, the district court sentenced Mr. Byerly to a combined sentence of one year in county jail on the misdemeanor convictions, and to prison terms on the felony convictions. The sentences on the felony convictions were suspended in favor of seven years of supervised probation. Mr. Byerly timely appealed to this Court. On March 27, 2018, he filed a W.R.A.P. 21 motion for a new trial based on numerous claims of ineffective assistance of trial counsel. This Court then stayed briefing on the appeal.

[¶12] The district court held an evidentiary hearing, and on September 17, 2018, it issued an order denying Mr. Byerly's Rule 21 motion. Mr. Byerly filed a timely notice of appeal to this Court, and we entered an order lifting the stay and setting a briefing schedule.

[¶13] On January 22, 2019, Mr. Byerly filed a second motion for a new trial, this time pursuant to W.R.Cr.P. 33(c). As grounds for this motion, he claimed that the State withheld exculpatory evidence in the form of data downloads from Ms. Pickerill's electronic devices, and that he was therefore entitled to a new trial. This Court again stayed briefing on Mr. Byerly's appeal.

[¶14] On March 22, 2019, following an evidentiary hearing, the district court denied Mr. Byerly's Rule 33(c) motion, and Mr. Byerly again filed a timely notice of appeal to this

---

[1] The State filed an earlier motion to join the cases, but withdrew it before it was ruled on. Concerning that motion, defense counsel stated during a February 14, 2017 pretrial hearing, "Mr. Byerly does object to the joinder of the cases and I believe the State's withdrawn that request at this time." The record contains no indication, however, that Mr. Byerly objected when the State filed its second joinder motion.

Court. This Court then consolidated Mr. Byerly's appeals, lifted the stay on briefing, and set a briefing schedule.

## DISCUSSION

[¶15] We will first address the State's contention that Mr. Byerly's appeal should be dismissed for failure to comply with the Wyoming Rules of Appellate Procedure. Then we will turn to Mr. Byerly's claims of error, which we address in a different order to provide an efficient discussion.

## I.      State's Request for Dismissal

[¶16] The State points to a number of deficiencies in Mr. Byerly's brief, including its failure to set forth a separate statement of issues for review, its failure to include a statement of the case setting out the relevant facts and procedural history, and its failure in portions of the briefing to provide required citations to the record. *See* W.R.A.P. 7.01. Based on these deficiencies, the State asks that we not consider Mr. Byerly's appeal. While we agree that the brief is deficient, we have previously expressed our reluctance to dismiss criminal appeals on such grounds.

> We agree with the State that Leger was remiss in his failure to prepare a brief that complies with our Rules of Appellate Procedure. We do not choose to dismiss the appeal for that reason, however. Leger clearly failed to comply with the Rule of Appellate Procedure that requires his brief contain separate sections briefly describing the nature of the case and the course of proceedings. *See* WYO.R.APP.P. 5.01(3), now 7.01(e)(1). Furthermore, Leger failed to include page references to the record in his statement of the facts. *See* WYO.R.APP.P. 5.01(3), now 7.01(e)(2).
>
> On a number of occasions we have warned members of our bar that we may dismiss an appeal for failure to comply with the Wyoming Rules of Appellate Procedure. *See Wyoming Game and Fish Comm'n v. Thornock*, 851 P.2d 1300 (Wyo. 1993); *Coones v. Fed. Deposit Ins. Corp.*, 848 P.2d 783 (Wyo. 1993); *Inter-Mountain Threading v. Baker Hughes Tubular Serv., Inc.*, 812 P.2d 555 (Wyo. 1991); *Jung-Leonczynska v. Steup*, 782 P.2d 578 (Wyo. 1989), *appeal after remand*, 803 P.2d 1358 (Wyo. 1990); *V-1 Oil Co. v. Ranck*, 767 P.2d 612 (Wyo. 1989). We do not retreat from that admonition, but the sanction of dismissal must be reserved primarily for civil cases. The dismissal of a criminal case

8

> simply confronts the court with a further claim of ineffective assistance of appellate counsel. Since the record in this case is not long, and the relevant portions of the record to permit review of the issues presented are easily found, our review has not been hampered by Leger's failure to comply with the Rules of Appellate Procedure. *See Steup*.

*Leger v. State*, 855 P.2d 359, 362-63 (Wyo. 1993).

[¶17]   Unlike the record in *Leger*, the record in this case is extensive, covering a five-day jury trial and two motions for a new trial, each of which had its own evidentiary hearing. Nonetheless, we are able to discern Mr. Byerly's issues from the manner in which he headed his arguments, and we thus remain reluctant to dismiss the appeal.  As usual, however, we will not consider arguments that are unsupported by cogent argument, cites to the record, and relevant authority.  *See Osban v. State*, 2019 WY 43, ¶ 7 n.2, 439 P.3d 739, 741 n.2 (Wyo. 2019) ("An appellant is required to present this court with relevant authority and cogent argument. It is not enough to identify a potential issue with the expectation that this court will flesh out the matter from there. The appellant, at a minimum, must attempt to relate the rule of law he depends upon to the facts of his case.") (quoting *Sonnett v. First American Title Ins. Co.*, 2013 WY 106, ¶ 26, 309 P.3d 799, 808 (Wyo. 2013)).  Additionally, we have held that we will not consider arguments that are supported by no more than a reference to arguments made to the district court.

> Appellant's argument cited neither pertinent authority nor made cogent argument. Appellant also incorporated by reference trial briefs contained in the record rather than the parts of the record relied on as directed by WYO.R.APP.P. 7.01(f). *See Scherling v. Kilgore*, 599 P.2d 1352 (Wyo. 1979) (noting that this method does not comply with the rules)[.]

*Davis v. Big Horn Basin Newspapers, Inc.*, 884 P.2d 979, 983 (Wyo. 1994).

[¶18]   We turn then to Mr. Byerly's claims, addressing first his claim of prosecutorial misconduct.

## II.   <u>Prosecutorial Misconduct</u>

[¶19]   Mr. Byerly claims the State committed prosecutorial misconduct by vouching for the victim's credibility and by failing to correct false testimony.  He did not object below, so we review these claims for plain error.  *Herrera v. State*, 2019 WY 93, ¶ 21, 448 P.3d 844, 850 (Wyo. 2019).  To establish plain error, an appellant must show that:

9

> "(1) the alleged error clearly appears in the record; (2) the alleged error clearly and obviously violates a clear and unequivocal rule of law; and (3) the alleged error affects a substantial right" to his material prejudice. *Cole v. State*, 2017 WY 87, ¶ 9, 399 P.3d 618, 620 (Wyo. 2017); *see also Brown*, ¶ 19, 332 P.3d at 1175. To satisfy the prejudice element of the plain error standard, a defendant must demonstrate a reasonable probability that he would have obtained a more favorable trial verdict without the error. *Larkins v. State*, 2018 WY 122, ¶ 94, 429 P.3d 28, 50 (Wyo. 2018).

*Herrera*, ¶ 24, 448 P.3d at 850-51 (quoting *Nielsen v. State*, 2018 WY 132, ¶ 23, 430 P.3d 740, 748 (Wyo. 2018)).

[¶20] To establish prosecutorial misconduct, Mr. Byerly must show "a prosecutor's improper or illegal act (or failure to act)." *Dixon v. State*, 2019 WY 37, ¶ 37, 438 P.3d 216, 231 (Wyo. 2019) (quoting *Craft v. State*, 2013 WY 41, ¶ 13, 298 P.3d 825, 829 (Wyo. 2013)). "Allegations of prosecutorial misconduct are settled by reference to the entire record and 'hinge on whether a defendant's case has been so prejudiced as to constitute denial of a fair trial.'" *Mraz v. State*, 2016 WY 85, ¶ 60, 378 P.3d 280, 294 (Wyo. 2016) (quoting *Hill v. State*, 2016 WY 27, ¶ 59, 371 P.3d 553, 568 (Wyo. 2016)).

## A.    Vouching for Credibility of the Victim

[¶21] "Wyoming law is clear that a prosecutor may not elicit opinions concerning witness credibility or personally vouch for the credibility of a witness." *Collins v. State*, 2015 WY 92, ¶ 34, 354 P.3d 55, 64 (Wyo. 2015) (quoting *Fennell v. State*, 2015 WY 67, ¶ 31, 350 P.3d 710, 722 (Wyo. 2015)). Vouching occurs when a prosecutor offers his opinion of a witness's credibility, as distinguished from when he infers credibility from the same evidence the jury has before it. *Collins*, ¶ 36, 354 P.3d at 64-65 (quoting *Fennell*, ¶ 43, 350 P.3d at 725).

## 1.    Prosecutor's Comment

[¶22] Mr. Byerly's first claim of vouching is based on a statement by the prosecutor at the conclusion of his direct examination of the victim. He stated, "Ms. Pickerill, I know it's been a very long day and I know this is hard to go back through. I appreciate your candor and your diligence." The record clearly reflects the comment so the first prong of the plain error analysis is met.

[¶23] We also find that the comment violated a clear and unequivocal rule of law and therefore find the second prong met. "Candor" can be defined in different ways, but among its meanings is honesty. *See Merriam-Webster's Collegiate Dictionary* 179 (11th ed.

2007).  The prosecutor's comment can thus be fairly viewed as thanking the victim for her honest testimony, and it effectively communicated the prosecutor's opinion that her testimony was truthful.  The comment was improper vouching and should not have been made.  *See Black v. State*, 2017 WY 135, ¶¶ 31-32, 405 P.3d 1045, 1055-56 (Wyo. 2017) (improper vouching in prosecutor's comments that a particular police officer was good and that lead detective had done unbelievable police work); *Hill*, ¶ 49, 371 P.3d at 566 (improper vouching in prosecutor's comment that State's expert was "one of the best witnesses that I have seen testify").

[¶24]  As to the remaining prong of our plain error analysis, however, we are unable to find that the error materially prejudiced Mr. Byerly.  There was but a single remark, and the jury returned not guilty verdicts on several charges for which Ms. Pickerill's testimony was the primary if not only supporting evidence.  We cannot conclude from this record that there was sufficient prejudice to have denied Mr. Byerly a fair trial.  *Mraz,* ¶ 60, 378 P.3d at 294.

## 2.    Testimony of Victim's Dentist

[¶25]  The second instance of alleged improper vouching came during the testimony of Ms. Pickerill's dentist, Dr. Carol Owens, which Mr. Byerly claims the prosecutor then improperly emphasized during his closing argument.  Dr. Owens testified:

> Q.    And again, this may seem like a silly question, but if you have the need for a root canal does that mean your tooth is in pain?
>
> A.    Not always.  Sometimes you can have asymptomatic and it may be discovered on an x-ray.
>
> Q.    And was that the case with Ms. Pickerill?
>
> A.    No, it was from her symptoms.
>
> Q.    And, again, can you categorize her explanation of the pain?
>
> A.    Michele's a pretty tough girl.  She's not a whiner or somebody that whines every time you touch her.  So I think if she says she's in pain, I probably would agree that she is.

[¶26]  During his closing argument, the prosecutor commented as follows on Dr. Owens' testimony:

11

Then the violent hit to the side of the head. She goes back because the pain continues in her teeth. In November she went to that visit and then just in January she had two root canals on those two teeth. Protracted pain. Do you remember the last thing Dr. Owens said? She's a pretty tough girl and if she says she's in pain, she's in pain.

[¶27] The record reflects the testimony and prosecutor's comments, so the first prong of the plain error analysis is satisfied. We do not, however, find a violation of a clear and unequivocal rule of law in either Dr. Owens' testimony or the prosecutor's comments. Dr. Owens did not testify that in her experience Ms. Pickerill was truthful, or that she believed Ms. Pickerill was in pain because she had been a truthful patient, or that she believed Ms. Pickerill's claim of abuse. She testified only that in her experience, Ms. Pickerill is tough. Her testimony spoke to Ms. Pickerill's pain threshold, not to her veracity, and though it may have incidentally bolstered the credibility of Ms. Pickerill's claims of pain, it was not vouching testimony. *See Spence v. State*, 2019 WY 51, ¶ 14, 441 P.3d 271, 275 (Wyo. 2019) (noting that "incidental bolstering of the victim's credibility alone does not make the expert testimony [on abuse] improper," so long as expert does not testify that she believed the claim of abuse).

[¶28] The prosecutor's comments were likewise not improper vouching. He did not offer his opinion that Ms. Pickerill's claims of protracted pain were true, but instead argued the inference to be drawn from Dr. Owens' testimony—that Ms. Pickerill was still in pain when she saw Dr. Owens. *See Collins*, ¶ 38, 354 P.3d at 65 (applying the controlling distinction between a prosecutor drawing a reasonable inference from evidence the jury heard and a prosecutor arguing from his own experience or opinions). We therefore find no plain error in Dr. Owens' testimony or the prosecutor's comments on the testimony.

## B.    Failure to Correct False Testimony

[¶29] Mr. Byerly claims that Ms. Pickerill's testimony that she turned over her laptop, iPad, and both of her phones to law enforcement was demonstrably false, and the State had an unequivocal duty to correct the false testimony. He offers no cites to the record to support his claim that the testimony was false, and we therefore will not consider the argument. *See Osban*, ¶ 7 n.2, 439 P.3d at 741 n.2 ("An appellant is required to present this court with relevant authority and cogent argument. It is not enough to identify a potential issue with the expectation that this court will flesh out the matter from there. The appellant, at a minimum, must attempt to relate the rule of law he depends upon to the facts of his case.").

### III. District Court's Denial of Mr. Byerly's W.R.Cr.P. 33(c) Motion

[¶30] Mr. Byerly filed a Rule 33(c) motion for a new trial based on his claim that the State violated the disclosure requirements of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by suppressing evidence of data downloads taken from the victim's iPhone and iPad, and the district court denied that motion. We find no error in the court's ruling.

[¶31] Review of the denial of a Rule 33(c) motion is for an abuse of discretion, but we review a district court's ruling on a claim that the State improperly suppressed exculpatory evidence de novo. *Dockter v. State*, 2019 WY 31, ¶ 16, 436 P.3d 890, 894-95 (Wyo. 2019) (quoting *Davis v. State*, 2017 WY 147, ¶ 18, 406 P.3d 1233, 1237 (Wyo. 2017)). Even in our review of constitutional claims, however, "we defer to the district court's findings of fact underlying its determination unless they are clearly erroneous." *Garriott v. State*, 2018 WY 4, ¶ 53, 408 P.3d 771, 788 (Wyo. 2018) (quoting *King v. State*, 2017 WY 129, ¶ 9, 403 P.3d 1070, 1073 (Wyo. 2017)). "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id*.

[¶32] "[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Worley v. State*, 2017 WY 3, ¶ 14, 386 P.3d 765, 770 (Wyo. 2017) (citing *Wilkening v. State*, 2007 WY 187, ¶ 7, 172 P.3d 385, 386-87 (Wyo. 2007)). To demonstrate a *Brady* violation, Mr. Byerly has the burden of showing: "(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defense; and (3) the evidence was material because there is a reasonable probability that, had the evidence been disclosed, the result of the proceedings would have been different." *Id*.

[¶33] Mr. Byerly claims that the State suppressed three electronic downloads from Ms. Pickerill's devices. He attached the extraction reports from those downloads to his Rule 33 motion and labeled them as follows: Exhibit A: February 3, 2016 download of Ms. Pickerill's iPhone; Exhibit B: December 8, 2016 download of Ms. Pickerill's iPhone; Exhibit C: December 8, 2016 download of Ms. Pickerill's iPad. We will first outline the background of each exhibit, and then we will turn to whether the downloads were suppressed and the materiality of the downloads.

### A. Background of the Downloads

### 1. Exhibit A

[¶34] On February 3, 2016, Ms. Pickerill turned her iPhone over to the Teton County Sheriff's Office to allow a download of its contents. The phone was encrypted with a

password that is separate from Ms. Pickerill's iTunes password, and also separate from the general phone access password. The encryption password is one that cannot be recovered, and if it is forgotten by the user, the encrypted data may not be accessed. When Ms. Pickerill provided the iPhone to law enforcement in February 2016, she could not recall the encryption password. Because the technician downloading the phone's contents did not have the encryption password, he was able to make a copy of its contents on that date, but he could not access the encrypted data. That copy was placed in what was called a .tar file, which was a mirror image of the phone's contents on that date. The .tar file contents could be accessed only with the encryption password.

[¶35] On August 5, 2016, shortly after the charges were filed against Mr. Byerly, the county attorney's office sent Mr. Byerly's attorney a packet with a cover letter that stated, "Enclosed please find the following discovery[.]" The letter identified three items being produced, one of which was "Apple Iphone [sic] Info, 21-002 (Flash Drive)." The flash drive that was produced contained the February 3, 2016 extraction report, which indicated that the .tar file had been created.

## 2.     **Exhibits B and C**

[¶36] On December 8, 2016, the Teton County Sheriff's Office performed another download of Ms. Pickerill's iPhone, and it also performed a download of her iPad. For this download from the iPhone, the office had Ms. Pickerill's encryption password, and the extraction therefore included all the data that was contained on the phone. On February 16, 2017, the county attorney's office sent Mr. Byerly's attorney additional discovery, which included notification that the downloads had been performed and were located on a thumb drive that was entered into evidence as item number 010.

## B.     **Suppression**

[¶37] To establish that the State suppressed the downloads in question, Mr. Byerly must demonstrate that it failed to disclose the evidence.

> Before a *Brady* violation occurs, the government, through the prosecutor or its agents, must have "suppressed" the information by not disclosing it to the defendant. *See Kyles v. Whitley*, 514 U.S. 419, 437-38, 115 S.Ct. 1555, 1567-68, 131 L.Ed.2d 490 (1995). In addition, if a defendant's attorney knew, or should have known through due diligence, about potential evidence it is generally not newly discovered. *See Beintema v. State*, 969 P.2d 1124, 1127 (Wyo. 1998) ("Huskinson's plea agreement with the prosecution was not newly discovered evidence because the trial attorney knew about the plea agreement prior to Beintema's trial.").

14

*Dockter*, ¶ 18, 436 P.3d at 895; *see also Hooks v. Workman*, 689 F.3d 1148, 1179-80 (10th Cir. 2012) ("Evidence is not suppressed within the meaning of *Brady* if it is made known and available to the defense prior to trial.") (quoting *United States v. Wooten*, 377 F.3d 1134, 1142 (10th Cir. 2004)).

[¶38]   We begin our suppression analysis with Exhibits B and C because we agree with the district court that those downloads were not suppressed.  We will then address Exhibit A, for which the suppression question is more complicated.

1.      **Exhibits B and C**

[¶39]   The district court found that the downloads contained in Exhibits B and C were not suppressed because defense counsel was informed, by letter dated February 16, 2017, that the downloads had been performed and placed on a thumb drive.  The court found that the State had satisfied its obligation by disclosing to defense counsel the existence and availability of the information, and that defense counsel could have inspected or copied the downloads before trial.  We agree.

[¶40]   "The essence of *Brady* is the discovery of information *after the trial*, which was known to the prosecution but unknown to the defense during the trial." *Davis*, ¶ 22, 406 P.3d at 1238 (quoting *Thomas v. State*, 2006 WY 34, ¶ 16, 131 P.3d 348, 353 (Wyo. 2006)) (emphasis in original); *see also Relish v. State*, 860 P.2d 455, 459 (Wyo. 1993) ("Evidence is not 'suppressed' if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence.") (quoting *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir.1982), *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983)).  Moreover, the State's disclosure of exculpatory evidence need not be "in a specific form or manner." *Hooks*, 689 F.3d at 1180 (quoting *United States v. Hernandez–Muniz*, 170 F.3d 1007, 1011 (10th Cir. 1999)).

[¶41]   *Hooks* is illustrative.  In that case, the Tenth Circuit rejected a *Brady* claim where the government informed defense counsel of its interview of a potentially favorable witness and gave an abbreviated description of her statement.

> We have no trouble concluding that the State fulfilled its *Brady* obligation here. Ms. High disclosed to Ms. Werneke that she had spoken with Ms. Prater and that Ms. Prater had opined that Mr. Hooks was mentally retarded. Evidence favorable to Mr. Hooks was thus "made known and available" to his counsel. *Wooten*, 377 F.3d at 1142. While Ms. High did not go into great detail about the conversation, she need not have. Not "every possible shred of evidence" need be disclosed, *Smith* [*v. New Mexico Dep't of Corrections*], 50 F.3d

[801] at 823 [(10th Cir. 1995)], nor is a "complete and detailed accounting" required, *Moore* [*v. Illinois*], 408 U.S. [786] at 795, 92 S.Ct. 2562 [(1972)]. The memo disclosed enough of the conversation with Ms. Prater to put counsel for Mr. Hooks on notice that favorable and possibly material evidence was available.

*Hooks*, 689 F.3d at 1180.

[¶42]  The same is true here.  The February 16, 2017 letter informed defense counsel of the December 2016 downloads, and it informed her that that they had been placed on a thumb drive and logged into evidence.  As the district court found, the downloads were available and could have been obtained on request.

[¶43]  Mr. Byerly does not dispute that defense counsel received the February 16, 2017 letter.[2]  He argues instead that a request for the downloads would have been unavailing because the later-appointed special prosecutor had no knowledge of the downloads.  The record does confirm that the downloads were done, and the February 2017 letter was sent, before the special prosecutor's appointment and that he did not know of them.  We do not see, however, that this would have been an impediment to obtaining the downloads.  Had defense counsel shared the February 16, 2017 letter with the special prosecutor, he would have been informed of the existence of the downloads, and presumably would have complied with a request for them.

[¶44]  The State disclosed the existence of the downloads to defense counsel and thereby made them available to Mr. Byerly.  The evidence contained in Exhibits B and C was not suppressed, and we therefore find no *Brady* violation with respect to that evidence.[3]

## 2.    <u>Exhibit A</u>

[¶45]  Mr. Byerly again does not dispute that the State informed defense counsel of the existence of the .tar file.  He instead contends that providing the notice was not sufficient, and that once the State learned of Ms. Pickerill's encryption password, the State had an obligation to use the password to create a download of the encrypted data in the .tar file. The district court noted that the law was unclear on whether such an obligation exists, and

---

[2] In his Rule 21 motion below, he acknowledged that the February 16, 2017 letter informed defense counsel that the December 2016 downloads were available.

[3] Because we agree with the district court that the February 16, 2017 letter satisfied the State's disclosure obligation, we need not determine for purposes of Mr. Byerly's suppression claim whether the defense team in fact obtained the December 2016 downloads.  Mr. Byerly asserts in his ineffective assistance of counsel claim that his trial counsel failed to obtain them, and to avoid confusing the district court's findings on the separate new trial motions, we will save our discussion of that point until we address the ineffectiveness claim.

16

without deciding the question, it rejected Mr. Byerly's claim because he failed to show the evidence contained in Exhibit A was material.

[¶46]   There is authority to suggest that the State would have no obligation to take the step urged by Mr. Byerly, as reflected in this Seventh Circuit decision rejecting a similar argument.

> [Gray argues] that *in advance of trial* the government should have directed EDS to create and run programs to extract data from its database that would be useful to the defense. That argument is a non-starter. E.g., *id.* [*United States v. Morris*, 80 F.3d 1151,] at 1168-70 [(7th Cir. 1996)]. "We find the proposed extension of *Brady* difficult even to understand. It implies that the state has a duty not merely to disclose but also to create truthful exculpatory evidence." *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003), overruled on other grounds by *Wallace v. City of Chicago*, 440 F.3d 421 (7th Cir. 2006). "The failure to create exculpatory evidence does not constitute a *Brady* violation." *United States v. Alverio–Melendez*, 640 F.3d 412, 424 (1st Cir. 2011); *see also United States v. Monroe*, 943 F.2d 1007, 1011-12 n.2 (9th Cir.1991). As it happened, the government for its own purposes ran such a program during the trial and having done so, as we know, promptly turned over the results to the defendant because they were potentially exculpatory. It had no duty to go further and conduct the defense's investigation for it.
>
> It may be helpful to distinguish between patent and latent exculpatory evidence. Patent exculpatory evidence is evidence that is exculpatory on its face; an example would be a confession by Suddoth, in the possession of the FBI, in which he took full responsibility for the fraud and described Gray as an innocent whom he had gulled. Such evidence is *Brady* material. Latent exculpatory evidence is evidence that requires processing or supplementation to be recognized as exculpatory. It is illustrated by the timestamp data in this case, the exculpatory character of which was unknown and unknowable until EDS wrote and ran the program that extracted the data from its database.
>
> To charge prosecutors with knowledge of exculpatory evidence buried in the computer databases of institutions that collect and store vast amounts of digitized data would be an

17

unreasonable extension of the *Brady* rule. The courts, rightly in our view, have refused to make it. The government is not "obliged to sift fastidiously" through millions of pages (whether paper or electronic). *United States v. Warshak*, 631 F.3d 266, 297 (6th Cir. 2010). It is "under no duty to direct a defendant to exculpatory evidence [of which it is unaware] within a larger mass of disclosed evidence." *United States v. Skilling*, 554 F.3d 529, 576 (5th Cir. 2009), vacated in part on other grounds, — U.S. —, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010); *cf. United States v. Joseph*, 996 F.2d 36, 37, 39-41 (3d Cir. 1993).

*United States v. Gray*, 648 F.3d 562, 567 (7th Cir. 2011).

[¶47] That said, commentators also increasingly recognize that electronic data may complicate a government's *Brady* obligations. *See* Comment, *Does Brady Have Byte? Adapting Constitutional Disclosure for the Digital Age*, 50 Colum. J. L. & Soc. Probs. 97, 116-17 (Fall 2016) ("Practitioners, scholars, and judges alike are grappling with the repercussions of a digital discovery regime for criminal litigation. Their concern centers on the recognition that the mechanics of *Brady* doctrine, established in an age of paper discovery, do not align with the demands of electronic discovery.") (footnotes omitted). Neither Mr. Byerly nor the State has argued the question of a prosecutor's *Brady* obligations with authority that is specific to the unique nature of electronic data, and without full briefing, we are reluctant to define those obligations.

[¶48] We therefore leave that question for another day and instead proceed to the prejudice prong. *See Dockter*, ¶ 18, 436 P.3d at 895 (noting it was questionable whether information was suppressed and concluding the question need not be addressed because defendant had not shown a reasonable probability the result would have been different); *Hicks v. State*, 2008 WY 83, ¶¶ 33-35, 187 P.3d 877, 884 (Wyo. 2008) (noting uncertainty in whether information could be considered suppressed and therefore resolving question on materiality prong).

## C.    <u>Materiality of Information in Exhibit A Download</u>

[¶49] Because we have concluded that the Exhibit B and C downloads were not suppressed, we need not address the materiality of the information contained in those downloads. For clarity and completeness, however, we will list each item of information that Mr. Byerly identifies as material to his defense. For those items drawn from Exhibit B or C, we will so indicate and omit any discussion of their materiality.

18

### 1.    Text Message re Jaw Pain

[¶50]  The first item Mr. Byerly points to is a January 7, 2016, text message from Ms. Pickerill to a friend, which stated: "I ended up having an emergency root canal yesterday as the crack in my tooth is what has been causing all of this pain.  I thought it was an ear infection."

[¶51]  This relates to the ear and jaw pain Ms. Pickerill experienced after the October 11, 2015 incident charged in Count 5 and for which Mr. Byerly was convicted of aggravated assault and battery.  Mr. Byerly argues this item could have been used to cross-examine Ms. Pickerill because she testified that she thought her jaw pain was caused by the blow across her face, not by an ear infection.  He contends the claim of jaw pain is particularly suspect because she never reported it to Dr. Trott, the ENT physician who treated her the day after the incident.

[¶52]  We disagree that this message would have had a material impact on the cross-examination of Ms. Pickerill.  That she wondered if the jaw pain she was experiencing three months after the October incident might be related to an infection does not mean that she could not also have believed her earlier persistent jaw pain was caused by the blow to her face.  Moreover, we do not agree that the report of jaw pain is missing from Dr. Trott's notes.  Dr. Trott saw Ms. Pickerill on October 12, 2015, a day after the incident alleged in Count 5, and he diagnosed a "small inferior TM [tympanic membrane] perforation with bruising of TM."  However, a little over a month later, Dr. Trott's notes report (emphasis added): "Seen about 1 month ago with left TM perforation following altercation with boyfriend.  *Also had jaw pain*.  She is *continuing to have ear and jaw pain*, bilateral, but L>R."

[¶53]  Ms. Pickerill's testimony that she thought her jaw pain was caused by the October 11 incident was consistent with what she reported to Dr. Trott.  Moreover, Ms. Pickerill's testimony and that of her treating physicians was not the only evidence to support Count 5.  The record also contains evidence of Mr. Byerly's conduct in the days following the Count 5 incident.  He sent emails in the days after the incident, in which he stated, "I am ashamed that we got in a fight n u got hurt;" "I feel like shit, completely sick about our fight especially you getting hurt;" "yes i am concerned abt your hearing of course. from my research it shows you can heal but it is more like 3 months;" "i truly apologize for a[n]y and all hurts ever inflicted;" and "please forgive me Michele I am soo very sorry."  He also, on October 16, 2015, signed up to take domestic abuse classes.

[¶54]  Against the evidence supporting Count 5, and the notes of jaw pain in Dr. Trott's notes, we cannot find a reasonable probability that cross-examination of Ms. Pickerill with her January 7, 2016 text message would have changed the outcome of Mr. Byerly's trial on Count 5.

## 2. Text Messages re Photos of Ms. Byerly's Injuries

[¶55] The next item Mr. Byerly points to are Ms. Pickerill's text messages seeking help to print photos stored on her iPhone onto photo quality paper because they print too dark on regular paper, as well as a response that she could try a shop in town where they can print from the phone and lighten the photo using PhotoShop. These text messages are contained in Exhibit C and were not suppressed.

## 3. Text Messages re Going to Bars and Drinking on January 20, 2016

[¶56] Mr. Byerly next cites to a series of text messages between he and Ms. Pickerill in which they discuss their plans for the evening of January 20, 2016, which was the date of the incident at the Mangy Moose that led to Count 8 (domestic battery) and Count 9 (strangulation of a household member). The messages between them discussed that she was going to a bar with friends and would then meet Mr. Byerly at the Moose. He argues that the messages are material to impeaching Ms. Pickerill because they show that she was in control of the events that evening and he was following her lead. We disagree.

[¶57] First, we fail to see how these text messages could have been unknown and a surprise to Mr. Byerly since he was a party to them. Second, they are entirely consistent with Ms. Pickerill's testimony that she went first to one bar with friends and then met Mr. Byerly at the Moose. Third, they do not establish that she was in control once she met up with Mr. Byerly and after they left the bar.

## 4. Text Messages re Timing of Events on January 20, 2016

[¶58] Mr. Byerly next points to text messages that concern the timing of the events on January 20, 2016. Specifically, he cites Ms. Pickerill's text message that evening to a friend, in which she gave him and his wife permission to stay another night at the house where she was caretaking and told him she would be there with Mark. He argues that the evidence establishes that nearly two hours after her arrival at the Moose, she was saying she would be going home with him, making it useful for cross-examination. We disagree that cross-examination on the evidence would have had a material impact.

[¶59] First, the messages do not establish the definitive timeline Mr. Byerly suggests. It shows a text message from Ms. Pickerill to Mr. Byerly at 5:35 p.m. stating that she is on her way, not that she had arrived at or was in the bar, and then at 7:11 p.m., the text to her friend. In any event, regardless of the timing of when Ms. Pickerill arrived at the bar and how much time passed before her interaction with Mr. Byerly deteriorated, there were two other witnesses who testified to the tension between Ms. Pickerill and Mr. Byerly while they were in the bar. Kim Trantham testified:

20

> Q.    And when you say you observed him being aggressive can you explain what made you think that?
>
> A.    He was standing really close to Michele, I can't – I don't know if he was grabbing her. I think he was grabbing her, holding her arms. And he was red and angry and that's why I thought . . .

Joshua Riggs testified:

> Q.    Do you recall anything in particular about that evening?
>
> A.    From what I remember I met Kim, she had been working. And we met up and we went upstairs and at one point I had my back to Mark and Michele and I didn't even realize they were there until I saw the look on Kim's face and she was basically saying, you've got to go stop this.
>
>       And I turned around and Mark was in her face yelling at her, just being belligerent. And so I walked over and I said – I asked him to calm down, you know, because it looked – he was getting really red in the face and I was worried something was going to happen. Mostly I wanted to check in on Michele.

[¶60] Finally, Ms. Pickerill did not testify definitively to when she arrived at the bar or how long she stayed at the bar. She testified that she believed she arrived shortly before 7:00, and estimated that she left before 8:00. Discrepancies in that timing when testified to over eighteen months after the fact were unlikely to have the impact of the witness testimony concerning the interactions in the bar, and we see no reasonable probability that the cross-examination would have changed the outcome on the charges related to that evening.

## 5.    Additional Text Messages re January 20, 2016

[¶61] Mr. Byerly points to several other text messages that relate to the events on January 20, 2016. The first is a text message in Exhibit A that he sent Ms. Pickerill late the evening of January 20, 2016, in which he berates her for causing their problems and tells her she needs therapy. He argues that the message shows that he was the one that wanted to break things off after being mistreated by her. We again presume that this message was not new information to Mr. Byerly since he sent the message himself. Moreover, numerous emails from Mr. Byerly to Ms. Pickerill were admitted into evidence and those showed that in the days following the January 20, 2016 incident, he repeatedly asked her to be with him and

asked her to ignore her friends' advice to the contrary. We do not see that the cited message from Mr. Byerly would have materially affected his cross-examination of Ms. Pickerill.

[¶62]   Mr. Byerly also points to Exhibit A for the lack of text messages from Ms. Pickerill concerning the incident in the parking lot.  He contends that this is evidence that nothing happened that evening and that her distress and report to law enforcement instead resulted from her intoxication and anger at him for breaking up with her. This again ignores the other evidence in the record.  As indicated above, Mr. Byerly's own emails in the days after the incident showed that he wanted Ms. Pickerill to be with him and had not broken up with her.  Additionally, while Ms. Pickerill may not have sent text messages after the incident, two separate couples who were staying in the home where she was staying testified to her being distraught after the incident and recounting the same story of what happened.  We cannot find that the lack of text messages would have had a material effect on the defense.

[¶63]   The final evidence Mr. Byerly points to that he claims would have been helpful to his defense against the January 20 charges was a text message from one of the persons who testified concerning Ms. Pickerill's demeanor after the incident.  The text message stated they were headed to dinner and getting drunker.  The text message Mr. Byerly cites was contained in Exhibit C and was not suppressed.

## 6.      Evidence re Protection Order Violation and Witness Intimidation

[¶64]   Mr. Byerly next point to a series of text messages that he claims were material to Counts 10, 11, and 12.  Each of the messages was drawn from Exhibit B or Exhibit C, and therefore none of them were suppressed.

[¶65]   We recognize that we must consider the cumulative effect of the allegedly suppressed evidence on our confidence in the verdict, as opposed to an item-by-item consideration of the evidence.  *Kerns v. State*, 920 P.2d 632, 637-38 (Wyo. 1996).  Even considered in that light, we are unable to find that Mr. Byerly's defense was prejudiced by the State not creating and producing Exhibit A before trial.

## IV.     Ineffective Assistance of Counsel

## A.      Standard of Review and Governing Law

[¶66]   The district court denied Mr. Byerly's W.R.A.P. 21 motion for a new trial after an evidentiary hearing on his numerous claims of ineffective assistance of counsel.  Our standard for reviewing that ruling is as follows:

> An appeal of an ineffective assistance of counsel ruling
> presents mixed questions of law and fact. *Miller v. State*, 2018

WY 102, ¶ 13, 424 P.3d 1284, 1287 (Wyo. 2018) (quoting *Worley v. State*, 2017 WY 3, ¶ 9, 386 P.3d 765, 769 (Wyo. 2017)). We review the district court's conclusions of law de novo and defer to its factual findings unless they are clearly erroneous. *Id*. "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Miller*, ¶ 13, 424 P.3d at 1287 (quoting *Cowboy's LLC v. Schumacher*, 2018 WY 61, ¶ 10, 419 P.3d 498, 501 (Wyo. 2018)).

*Wall v. State*, 2019 WY 2, ¶ 38, 432 P.3d 516, 527 (Wyo. 2019).

[¶67]   Mr. Byerly asserts numerous claims of ineffectiveness.  To prevail on those claims, he must show that his counsel "rendered constitutionally deficient performance" and that absent that deficiency, "a reasonable probability exists that [he] would have enjoyed a more favorable verdict."  *Larkins v. State*, 2018 WY 122, ¶ 62, 429 P.3d 28, 43 (Wyo. 2018) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 695, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674 (1984)).

To show that trial counsel's performance was constitutionally inadequate, the defendant must demonstrate that the attorney's performance was substantially below that of a reasonably competent attorney. *Bruckner v. State*, 2018 WY 51, ¶ 15, 417 P.3d 178, 181-82 (Wyo. 2018). We "evaluate[ ] counsel under the circumstances existing at the time of the challenged act or omission and from the perspective available at the time of the challenged act or omission." *Id*. at ¶ 15, 417 P.3d at 181. Because a defendant must establish both prongs, a court can decide an ineffective assistance claim on the prejudice prong without considering the deficient performance prong. *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069.

*Wall*, ¶ 39, 432 P.3d at 527 (quoting *Larkins*, ¶ 62, 429 P.3d at 43-44).

## B.    **Analysis of Mr. Byerly's Claims**

[¶68] Between his headings and subheadings, Mr. Byerly asserts fourteen claims of ineffectiveness.  We reject all fourteen.

23

### 1.    Failure to Obtain Evidence in Possession of the State

[¶69]   Mr. Byerly first claims trial counsel was deficient in failing to obtain the downloads contained in Exhibits A, B, and C, which were the subject of his Rule 33 motion.  With respect to the downloads contained in Exhibit A, we have found that Mr. Byerly's defense was not prejudiced by not having that information.  We therefore resolve this aspect of the claim on the prejudice prong, and we need not address whether trial counsel was deficient in failing to pursue the information in Exhibit A. *Wall*, ¶ 39, 432 P.3d at 527 ("Because a defendant must establish both prongs, a court can decide an ineffective assistance claim on the prejudice prong without considering the deficient performance prong.").

[¶70]   With respect to the downloads in Exhibits B and C, the district court made the following findings:

> 23.     With respect to the Later-Disclosed Data, trial counsel was provided at the May 22 hearing with a report from the Teton County Sheriff's Office that showed two pieces of evidence: a phone interview with a witness [name omitted] and a CD [thumb drive] of data from some phones.  Trial counsel testified that she did not recall seeing that report prior to trial but that perhaps her private investigator did.  She testified that she relies on her investigator, Mr. Dugan, to review all evidence for exculpatory material and then discuss the results of his review with her.  In this case, her investigator billed her for 149 hours of work interviewing witnesses, reviewing discovery received from the State, and reviewing what Defendant and his previous counsel provided to trial counsel.  She testified that Mr. Dugan also billed Mr. Byerly directly for additional hours of work.
>
> * * * *
>
> 28.     The Court finds that it was reasonable for trial counsel to rely on her investigator to review discovery material for exculpatory evidence.  In this case, it was a reasonable professional judgment to hire an assistant, i.e., the investigator, to assist in reviewing the voluminous discovery materials.

[¶71]   The district court essentially concluded that although trial counsel did not herself request and review the Exhibit B and C downloads, the defense team had them and they were reviewed.  Mr. Byerly does not directly address this finding, but he contends it would have been impossible for the defense to have had the downloads before trial because the

24

special prosecutor did not know of the thumb drive's existence until after the trial. We disagree.

[¶72] The special prosecutor took over the case against Mr. Byerly on March 20, 2017, after the Exhibit B and C downloads were done and after the February 16, 2017 letter to trial counsel informing her of the thumb drive containing the downloads. For whatever reason, the thumb drive was not in the files that were given to the special prosecutor, and he therefore did not know of it. It does not follow, however, that trial counsel either herself or through her investigator did not receive the downloads before the special prosecutor's appointment, and the record shows that the defense team in fact had and reviewed the downloads.

[¶73] First, as the district court found, trial counsel did not recall the thumb drive that contained the December 2016 downloads, but she relied on her investigator to review material provided in discovery and to inform her of important items and exculpatory information. The record shows that trial counsel's investigator worked nearly two hundred hours on the case, and trial counsel also testified to reviewing hundreds of pages of emails. Trial counsel also testified concerning the various downloads:

> Q.     Okay. Did you see any text or any text messages that were contained in that extraction report?
>
> A.     So, typically when you get an extraction report it should have everything. Every photograph, even the GPS markings where those photographs were taken. Dates, times, texts, anything that came through that phone.
>
>     Mr. Byerly and I had discussed and he pointed out as well when I took over the case that it appeared that numerous texts were not part of that download.
>
> \* \* \* \*
>
> Q.     Did you – did you see any web history on that extraction report?
>
> A.     I don't know if it was memes and gifs or if it was web history, I'd have to go back and look at that report. I wasn't looking for Ms. Pickerill's general email searches. What I was looking for was information between and conversations between Mr. Byerly and Ms. Pickerill.
>
> Q.     Okay.

25

A. So I don't remember specifically web searches.

Q. Okay. And did you ever make a request for the underlying backup file from that phone?

A. When that request was made, it was made after Mr. Byerly's trial. I believe you have the email and you submitted those as exhibits already as part of your motion.

Q. Okay. So you did end up requesting that backup file?

A. I don't know if that's a backup file. I'm not familiar with the .tar file. After trial Mr. Byerly had spoken with some additional experts who were then requesting the .tar file. Prior to trial we had engaged an expert, I believe for the recording. We had discussed at length experts on the telephone portions. Mr. Byerly was not interested in hiring an expert for the telephone portions at that time. I did not hire one on his behalf.

So, at the time the .tar file was requested, which I'm not familiar with, that was done after trial after Mr. Byerly had spoken with some additional person.

Q. Okay. And did you receive that backup file then?

THE COURT: I'm sorry, pardon my interruption. Mr. Byerly was not interested in hiring experts on the phone issue, can you clarify what that means? Are you talking about the extraction report on the victim's phone?

THE WITNESS: Throughout working with Mr. Byerly and in numerous conversations that he had with me and my investigator he was very concerned about the phone, whether or not photographs on the phone had been manipulated, whether or not text messages were missing. He was also very concerned about an audio recording that we had that we successfully kept out of the trial proceedings.

And so the idea of hiring an expert was something that we discussed quite a lot. I'm not an expert on the phones. Mr. Byerly had pretty substantial knowledge, but he didn't qualify as an expert and I wasn't willing to call him to testify to those

things. An expert was never hired and we moved forward with just Mr. Byerly's request later on.

[¶74] It is apparent from trial counsel's testimony that the defense team had the later-produced data downloads, those found in Exhibits B and C, and that they reviewed and discussed the information.[4] That is further evidenced by trial counsel's use of evidence from the downloads to cross-examine Ms. Pickerill. Trial counsel prefaced her cross-examination with questions concerning Ms. Pickerill's consent to a search of her cell phone, and then when she moved for admission of the exhibit, she explained, "They were provided by the State as part of the cell phone dump."

[¶75] Based on the record, we find no clear error in the district court's finding that trial counsel obtained the data downloads in Exhibits B and C, and Mr. Byerly has therefore failed to show that counsel was ineffective.[5]

## 2.    Failure to Object to State Exhibits

[¶76] Mr. Byerly's second claim is that trial counsel was ineffective in failing to object to a number of State exhibits on foundation and chain of custody grounds. In support of this claim, he lists a string of exhibits by number and makes a conclusory argument concerning best evidence, with no citation to or discussion of relevant authority. Because this claim is not supported by cogent argument, we do not consider it. *Osban*, ¶ 7 n.2, 439 P.3d at 741

---

[4] The record contains evidence of only two data downloads, the one that took place in February 2016 without the encryption password, and the one that took place in December 2016 with the encryption password. The February 2016 download resulted in the .tar file with otherwise no accessible data. It is therefore reasonable to assume that the downloads in trial counsel's possession were the subsequent December 2016 downloads that later became known as Exhibits B and C.

[5] Mr. Byerly limits his claim to trial counsel's alleged failure to obtain the data downloads and makes no claim that trial counsel was ineffective in her evaluation or use of the data. Although that is the case, Mr. Byerly's allegation of photo manipulation permeates his briefing, so we will take this opportunity to address the text messages he contends support his allegation. The messages were sent the day before the hearing on Ms. Pickerill's application for a protection order. She wrote to her daughter and to a friend and asked if they could print the photographs from her telephone to photo quality paper because they came out too dark on regular paper. Her friend responded that she should go to a shop in town and "just walk in w your phone & they can tell you how to send them to them, run them in PhotoShop to work in the lighting & print . . . you best hurry tho-they might close by 6." We fail to see that cross-examination on this front would have affected the verdict. First, the conversation was fairly innocuous, particularly in light of the photographs admitted into evidence at trial. The photographs were not especially clear or graphic, in contrast to what one might expect with photo manipulation. More importantly, Mr. Byerly was acquitted of the charge to which the photographs of bruising on Ms. Pickerill's arms related, so the cross-examination obviously would not have affected the verdict on that count. As to the remaining two photographs, they showed redness on Ms. Pickerill's face and were admitted as evidence of the October 2015 aggravated assault and battery charge. Given the other evidence on that count, including the medical finding of a perforated eardrum the day following the incident and Mr. Byerly's email apologies both for the fight and that she got hurt, we cannot see that cross-examination on the conversation between Ms. Pickerill and her friend would have yielded a different verdict.

27

n.2 ("An appellant is required to present this court with relevant authority and cogent argument. It is not enough to identify a potential issue with the expectation that this court will flesh out the matter from there. The appellant, at a minimum, must attempt to relate the rule of law he depends upon to the facts of his case.").

### 3. Failure to Seek Sanction of Witness Exclusion and Object to Treatment Note

[¶77]  Mr. Byerly next claims that trial counsel was ineffective in failing to seek exclusion of Dr. Josie Wittner's testimony for her failure to comply with a defense subpoena for records.  He further claims that trial counsel should have objected to her treatment notes on hearsay grounds.  Mr. Byerly acknowledges that Dr. Wittner's testimony and notes related to Count 1, for which he was acquitted, but he argues: "The prejudicial cumulative impact of each additional unnecessary witness for the State was to essentially run out the clock, take time and energy from the jury that Mr. Byerly could have used to present additional witnesses on his own behalf."

[¶78]  Mr. Byerly cites to nothing in the record to suggest that the State put on witnesses to run out the clock or that he was precluded from putting on witnesses because of time constraints.  Nor is there anything to suggest that the jury lacked the energy or time to consider each charge carefully.  It deliberated from 10:20 a.m. on the fifth day of trial until 7:13 that evening, and it returned a verdict of not guilty on six of the twelve counts.  Because Mr. Byerly has not shown he was prejudiced by Dr. Wittner's testimony and report, we need not consider this claim further.

### 4. Failure to Limit or Exclude Objectionable Testimony by Victim

[¶79]  Mr. Byerly next claims that Ms. Pickerill's testimony was "replete with inadmissible statements" and that trial counsel was ineffective in failing to object.  In support of his claim, he directs us to the Rule 21 motion he filed with the district court, and he otherwise provides no legal analysis.  Because he does not support his claim with cogent argument, we do not consider it.  *Davis*, 884 P.2d at 983 (arguments supported only by reference to trial briefs will not be considered); *Osban*, ¶ 7 n.2, 439 P.3d at 741 n.2.

### 5. Failure to Object to Expert Testimony

[¶80]  Mr. Byerly next claims trial counsel was ineffective in failing to object to expert testimony that exceeded the scope of the State's pretrial designation.  Mr. Byerly does not support this claim with cites to the relevant parts of the record or with any legal analysis, and we therefore do not consider it.  *Osban*, ¶ 7 n.2, 439 P.3d at 741 n.2.

**6.** **Failure to Object to Testimony by Other State Witnesses**

[¶81]   Mr. Byerly next claims trial counsel was ineffective in failing to object to hearsay and speculation in the testimony of other State witnesses.  In support of this claim, he again offers no legal analysis or record cites and instead directs us to his Rule 21 motion filed with the district court.  Because he does not support his claim with cogent argument, we do not consider it.  *Osban*, ¶ 7 n.2, 439 P.3d at 741 n.2; *Davis*, 884 P.2d at 983.

**7.** **Failure to Seek Admission of Victim's Prior Statements into Evidence**

[¶82]   Mr. Byerly next claims that trial counsel was ineffective in failing to seek admission of the transcript of Ms. Pickerill's testimony in the protection order hearing; her written statement to law enforcement; and her recorded interview with law enforcement.  With respect to prejudice, he contends:

> The most material element of the civil protection order hearing transcript to Mr. Byerly's defense was the statement by Ms. Pickerill that on January 20th, 2016, Mr. Byerly was "hovering" over her as she was in the snowbank in the parking lot of the Mangy Moose, not being actually touched or held down.  (T.T. p. 459, L.2 – p. 460, L.7).  That is a critical distinction with respect to Count 9 and it is reasonable to think that had the jury been able to reference the transcript of that hearing during their deliberations, that distinction would have been more evident and would have provided the basis for Mr. Byerly to be acquitted of Count 9.

[¶83]   Mr. Byerly provides no analysis of the admissibility of the three items he contends should have been admitted, and he provides no cites to where in the record the items can be found.  Moreover, even if the items had been admitted, they are testimonial statements and as such would not have been permitted to go to the jury room during deliberations.  *Bogard v. State*, 2019 WY 96, ¶¶ 88-90, 449 P.3d 315, 336 (Wyo. 2019) (Davis, C.J., concurring); *see also Warner v. State*, 897 P.2d 472, 475 (Wyo. 1995).  For these reasons, we do not consider this claim any further.

**8.** **Failure to Have Entire Bohan Interview Played**

[¶84]   When Tim Bohan met with law enforcement concerning his December 2016 statement to Ms. Pickerill, in which he warned her to drop the charges against Mr. Byerly or else, he admitted to making the statement to her and that he had done so at Mr. Byerly's request.  At trial, Mr. Bohan recanted and testified that Mr. Byerly did not ask him to deliver the message.  In response, the State called Detective Sachse, who had conducted the recorded interview of Mr. Bohan.  Detective Sachse testified to what Mr. Bohan told

him, and then the State played a portion of the recorded interview in which Mr. Bohan can be heard saying that Mr. Byerly asked him to deliver the message to Ms. Pickerill. Trial counsel did not ask that the entire recorded interview be played for the jury, and Mr. Byerly points to that decision as his next claim of ineffectiveness.

[¶85] In support of his claim, Mr. Byerly cites our decision in *Fennell v. State*, 2015 WY 67, ¶ 65, 350 P.3d 710, 730 (Wyo. 2015), where we held that trial counsel's failure to ask that audio tapes of the controlled buys at issue be played in their entirety was ineffective assistance of counsel. In *Fennell*, we reached that conclusion because the tapes would have been helpful in refuting some of the prosecution's assertions. *Id*. In Mr. Byerly's case, though, we agree with trial counsel that playing the remainder of the Bohan interview would have done more harm than good.

[¶86] Trial counsel testified:

> I did ask Mr. Sachse very clearly how long the interview was and was very specific that the only time Mr. Bohan said Mark sent this message was the one time that was played and all other times he adamantly said he did not and Detective Sachse agreed with me. That seemed to me a much stronger Tim Bohan to present than letting them listen to an interview where I think you just feel sorry for Mr. Bohan, even more than they already did. That he's trying not to get his friend in trouble.
>
> My concern with the interview is that Mr. Bohan realized he did something that was getting Mark in trouble and it sounds like he's backpedaling to a large degree. As much as I know Mr. Byerly thinks he hears over and over again that Tim Bohan says no I didn't, no I didn't, no I didn't, I felt it was much stronger to have him say that word for word to the jury and not get into any of the nuances of the interview where he sounds like he's trying to help a friend from getting in trouble.

[¶87] Counsel is entitled to "wide latitude" in making "tactical decisions." *Winters v. State*, 2019 WY 76, ¶ 53, 446 P.3d 191, 210 (Wyo. 2019) (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065). Additionally, we approach claims of ineffectiveness with "a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable judgment." *Winters*, ¶ 12, 446 P.3d at 199 (quoting *Schreibvogel v. State*, 2010 WY 45, ¶ 47, 228 P.3d 874, 889 (Wyo. 2010)). Having listened to Detective Sachse's interview of Mr. Bohan, we find that counsel exercised more than reasonable judgment in not asking that the jury be allowed to hear the entire interview.

[¶88]  We note that Mr. Byerly does not cite to the interview itself in his argument, but instead cites to descriptions of the interview from the Rule 21 hearing.  Having listened to the interview, we find that the descriptions do not accurately portray the remainder of the interview, and we are at a loss to understand why Mr. Byerly would want the jury to hear the interview in its entirety.  First, while Mr. Bohan did deny that Mr. Byerly used firearms on hunting trips with him, we did not hear him deny that Mr. Byerly asked him to pass along his message to Ms. Pickerill.  The interview lasted about twenty-five minutes, and if there was a denial in there, we question whether a jury would have caught it.  Moreover, the interview contained a number of statements the admission of which, if not error, certainly would have been damaging to the defense, including:[6]

> --Detective Sachse's question of why Mr. Bohan believes Mr. Byerly would ask him to deliver the message in violation of the protective order, and Mr. Bohan's response that Mr. Byerly is desperate, scared, and hating life right now;

> --Mr. Bohan's statement that Mr. Byerly won't own up to anything;

> --Mr. Bohan's statement that Ms. Pickerill shared other incidents with him that he had never heard about and Detective Sachse's response that that is not unusual and that it is common for victims of trauma to keep remembering additional incidents as time passes;

> --Detective Sachse's statement that Mr. Byerly won't man up and take responsibility;

> --Mr. Bohan nodding and agreeing with Detective Sachse that Mr. Byerly took advantage of him;

> --Mr. Bohan's statement that he should have talked to a lawyer before speaking with Ms. Pickerill; and

> --Detective Sachse's statement that he knows of no lawyer that would have advised Mr. Byerly to have his friend pass a message to Ms. Pickerill.

[¶89]  We therefore find no ineffectiveness in trial counsel's decision not to ask that the jury hear the entire Bohan interview.

---

[6] These are not all the statements that we find would have been damaging to the defense, and these are not direct quotes but rather a close paraphrasing.

31

## 9.     Failure to Object to Vouching Statements by Witnesses and Prosecutor

[¶90] Mr. Byerly next claims trial counsel was ineffective in failing to object to the vouching comments that we addressed in our earlier discussion of his prosecutorial misconduct claim. Having found vouching in only one comment by the prosecutor and no prejudice resulting from that comment, we need not address whether trial counsel was deficient in not objecting and moving to have the remark stricken and the jury instructed to disregard it.

## 10.     Failure to Call Witnesses Favorable to the Defense

[¶91] Mr. Byerly next points to the fact that trial counsel filed a pretrial memorandum that listed thirty-two potential defense witnesses, but she called only two witnesses. Based on that, he claims trial counsel was ineffective in failing to call additional witnesses.

[¶92] With regard to trial counsel's decision not to call certain witnesses, we have said:

> The charge that a defendant was denied effective counsel because his attorney did not call witnesses has often been raised. The decision not to call witnesses is a strategic choice. *Amin* [*v. State*,] 811 P.2d [255,] 261-62 [(Wyo. 1991)]; *Laing v. State*, 746 P.2d 1247, 1250 (Wyo. 1987). In order to successfully show ineffective assistance of counsel, the appellant must present the facts about which the proposed witnesses would have testified. *Campbell* [*v. State*,] 728 P.2d 628 [(Wyo.1986)]. The decision whether to call witnesses is normally within the judgment of counsel and will rarely be second-guessed through appellate hindsight. *State v. Onishi*, 64 Haw. 62, 636 P.2d 742, 744 (1981).

*Brock v. State*, 2012 WY 13, ¶ 13, 272 P.3d 933, 937 (Wyo. 2012) (quoting *Eustice v. State*, 11 P.3d 897, 904 (Wyo. 2000)).

[¶93] Mr. Byerly does not identify the witnesses that should have been called or the facts to which they would have testified and has thus failed to show ineffectiveness in trial counsel's decision to limit the number of defense witnesses.

## 11.     Failure to Introduce Defense Photographs

[¶94] Mr. Byerly next claims that defense counsel was ineffective in failing to have a strategy to introduce photographs of his injuries. He does not offer an available strategy, and he supports this claim with only a reference to his Rule 21 motion. We therefore do not consider the claim further. *Davis*, 884 P.2d at 983.

## 12.    Failure to Adequately Investigate or Prepare for Trial

[¶95]   Mr. Byerly next claims that defense counsel was ineffective in failing to investigate and prepare for trial.  In support of this claim, he cites the failure to obtain the data extractions from Ms. Pickerill's electronic devices, the failure to interview the bartender at the Mangy Moose, the failure to interview a potential witness named Brian Rutter, and the failure to discover that one of the seated jurors had a social relationship with Ms. Pickerill and Mr. Bohan.[7]

[¶96]   Regarding claims of ineffectiveness based on a failure to investigate or interview witnesses, we have said:

> A claim of ineffective counsel based on a failure to interview witnesses is reviewed as a claim of failure to conduct a reasonable investigation. *See Duke v. State*, 2004 WY 120, ¶ 55, 99 P.3d 928, 947 (Wyo. 2004) (analyzing Duke's claim that counsel failed to interview any of the State's witnesses as a failure to make reasonable investigation); *Gist v. State*, 737 P.2d 336, 343 (Wyo. 1987) ("The failure to pursue an interview of Roger Gist constituted an abrogation of counsel's duty to Steve Gist to conduct a reasonable investigation . . . ."). "Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Duke*, ¶ 55, 99 P.3d at 947. We "assess[] counsel's performance by considering all of the circumstances existing at the time counsel made the investigative decision and appl[y] a heavy measure of deference to counsel's judgments in this regard." *Id.* "[A]n appellant cannot prove ineffective assistance of counsel for failure to investigate 'where an appellant fails to identify the *favorable evidence or witnesses that additional investigation* would have revealed.'" *Brock v. State*, 2012 WY 13, ¶ 17, 272 P.3d 933, 938 (Wyo. 2012) (emphasis added) (quoting *Asch v. State*, 2003 WY 18, ¶ 41, 62 P.3d 945, 958-59 (Wyo. 2003)).

*Winters*, ¶ 46, 446 P.3d at 207-08.

[¶97]   Concerning the extent of the defense team's investigation and preparation for trial, trial counsel testified:

---

[7] We addressed the alleged failure of trial counsel to obtain data extractions from Ms. Pickerill's electronic devices in one of Mr. Byerly's earlier ineffectiveness claims and will not do so again here.

33

When I look through my records I have over 243 pages of notes of interactions with Mr. Byerly. I spent 199.03 hours through sentencing on his case.

I would venture to guess that there was basically not a day that went by that he wasn't a part of my life once I took this case. And I also hired an investigator to both counsel him and work with him. Mr. Dugan invoiced me for 149 hours and there was an additional 50 hours that he spent and told me that he did not ask to have be repaid.

[¶98] Concerning the alleged failure to interview the potential witnesses identified in Mr. Byerly's claims, trial counsel testified:

Q. All right. Move on here to some of the – kind of come back to some, I guess, best way I can describe it discovery issues. For instance, an issue initially arose with a potential juror on the list, Brian Rutter. Do you recall that?

A. From your motion, I do.

Q. Okay. And there was an indication that – well, I think everyone agreed that Mr. Rutter had in fact been in the Mangy Moose on January 20th. Does that sound correct to you.

A. I think that's what he reported. I mean I wasn't there.

Q. Fair enough. And do you recall the state saying that he had in fact been interviewed about that?

A. I do.

Q. Okay. Do you recall Mr. Rutter was actually on the state's witness list?

A. I do. Mr. Byerly pointed that out to me, in fact.

Q. Okay. Do you recall ever seeing a report of that interview with Mr. Rutter?

A. No, I did not.

34

Q. Did it ever occur to you when the state said we interviewed him and talked to him about what he saw and didn't think it would help our case, did that ever make you think perhaps he could help yours?

A. All that meant to me was that he hadn't seen anything. And, again, in investigations – I think you bring it up with like the bartender – sometimes you need to stop when you're ahead. If someone told the cops they didn't see anything, I'm not going to be the one to ask them to reconsider if they really did.

And so with both of those – and we did on cross about The Mangy Moose at length that nobody saw anything happen, that was well testified to on the stand.

[¶99] Concerning the defense team's investigation and preparation for jury selection, trial counsel testified:

Q. Did you ever learn from the prosecutor who the very good friends with Ms. Pickerill were on the jury panel?

A. I didn't learn that from Mr. Dunlap, but that was reviewed with Mr. Byerly. So, when we got the jury lists and the questionnaires I emailed that to Mr. Byerly, I emailed it to Dan Dugan, and I emailed it to Terry Vaughan [the defense team's body language expert]. All of us went through it to see if we knew someone, didn't know someone and we actually had a running spread sheet.

I don't know if Mr. Byerly ever asked us specifically, where we would [mark] red for good, green for bad or vice versa and yellow for let's do a background check and see what we can find out about this person.

So, I didn't learn that information from Mr. Dunlap. I learned from Mr. Byerly that we were probably going to have a very contested panel of jurors that knew both of them very well because of their length of time in the community. And we discussed each of the jurors that was on that list as potential reasons for bias and why they should be discussed.

[¶100] We find nothing unreasonable in the scope of the defense team's investigation and preparation for jury selection and trial. Giving due deference to trial counsel's tactical

decisions, we also find that the decisions regarding which witnesses to interview were reasonable. In any event, Mr. Byerly makes no effort to show how he was prejudiced by the failure to interview the two identified witnesses, so his ineffectiveness claim fails on both prongs.

[¶101] With respect to the seating of a juror whom Mr. Byerly claims had a social relationship with Ms. Pickerill and Mr. Bohan, Mr. Byerly again makes no effort to show prejudice. The claim concerns a juror who, during a break in Ms. Pickerill's direct examination, reported having met Ms. Pickerill on one occasion and knowing Mr. Bohan through another friend. He did not know Mr. Bohan's last name and was unsure if the "Tim" being discussed was the same one. After the juror confirmed that he had never discussed the case with either one, neither party requested his removal. Because Mr. Byerly has not shown that he was prejudiced by failure to challenge this juror, we do not consider the claim further.

## 13.      Trial Counsel's Disparaging Comments During Opening Statement

[¶102] During trial counsel's opening statement, she said, "I'll be frank with you, my client's not an angel. He's a womanizer. He's a recovering alcoholic. And I'm sorry to say he's not my most favorite person on the planet." Mr. Byerly claims trial counsel was ineffective in making these comments.

[¶103] Trial counsel testified that before trial, she worked with a body language expert, who expressed concerns that "because of Mr. Byerly's presence the jury was not going to care for him and therefore not care for anything that came from the defense attorney or his side." She further testified that she talked extensively with Mr. Byerly about the opening statement, and they had meetings with the investigator and the body language expert about making the comments. She stated that she understood Mr. Byerly did not like the comments, but that he deferred to her judgment. Trial counsel explained her strategy in including the comments:

> [A]s I explained to him, my strategy was that I wanted to air the dirty laundry first. . . .
>
> I wasn't – I didn't know if Michelle was going to get up here and try to say, you know, he's out with all these women cheating on me. And there was a lot of alcohol on both parts here. So, my strategy in saying that was no one ever thinks a defense attorney is going to tell them the truth. The perception from the jury is that defense attorney is going to hide everything I really need to see and they're going to look to Mr. Dunlap for the authority on what's real. And the strategy in

36

that was to come out and say, no, our side is telling you the truth. I'm going to be real up front with you in the beginning.

[¶104] Giving the required deference to trial counsel's tactical decisions, and considering the circumstances, we find nothing unreasonable in counsel's approach to the opening statement.

## 14. Failure to File Motions for Judgment of Acquittal and New Trial

[¶105] For his final ineffectiveness claim, Mr. Byerly contends that trial counsel was deficient in failing to file a motion for judgment of acquittal and a motion for new trial. We will address each claim separately.

### a. Motion for Judgment of Acquittal

[¶106] Concerning motions for judgment of acquittal, we have said:

> In reviewing the denial of a motion for judgment of acquittal, we examine and accept as true the evidence of the prosecution together with all logical and reasonable inferences to be drawn therefrom, leaving out entirely the evidence of the defendant in conflict therewith.
>
> A motion for judgment of acquittal is to be granted only when the evidence is such that a reasonable juror must have a reasonable doubt as to the existence of any of the essential elements of the crime. Or, stated another way, if there is [sufficient] evidence to sustain a conviction of the crime, the motion should not be granted. This standard applies whether the supporting evidence is direct or circumstantial.
>
> *Butcher v. State*, 2005 WY 146, ¶ 11, 123 P.3d 543, 548 (Wyo. 2005).
>
> *Bruce v. State*, 2015 WY 46, ¶ 52, 346 P.3d 909, 926 (Wyo. 2015). In other words, "[o]ur duty is to determine whether a quorum of reasonable and rational individuals would, or even could, have come to the same result as the jury actually did." *Wilkerson v. State*, 2014 WY 136, ¶ 28, 336 P.3d 1188, 1200 (Wyo. 2014) (citations omitted).

*Kite v. State*, 2018 WY 94, ¶ 35, 424 P.3d 255, 265 (Wyo. 2018) (quoting *Pearson v. State*, 2017 WY 19, ¶ 10, 389 P.3d 794, 796-97 (Wyo. 2017)).

37

[¶107] In arguing trial counsel should have moved for a judgment of acquittal, Mr. Byerly does not adhere to the manner in which such a motion would have been considered by the district court. Instead of accepting the State's evidence as true, including all of Ms. Pickerill's testimony, and giving it all logical and reasonable inferences, as the district court would have done had it ruled on such a motion, he dissects the State's evidence, points to inconsistencies, and argues against the credibility of the evidence. Because he has not applied the standard that would have governed a motion for judgment of acquittal, he has not shown any deficiency in trial counsel's decision not to file the motion.

**b.** **Motion for New Trial**

[¶108] In support of his claim that trial counsel was ineffective in failing to file a motion for new trial, Mr. Byerly cites our decision in *Ken v. State*, 2011 WY 167, 267 P.3d 567 (Wyo. 2011). His reliance on *Ken* is misplaced. In that case, we found ineffective assistance not because trial counsel failed to move for a new trial but because he filed an untimely motion.

> The parties in the present case stipulated that defense counsel filed the motion for new trial after the time for filing such a motion had expired. *While a motion for new trial is not required in every case, in cases where one is filed it must be filed within the time permitted by the rules*. Not filing a new trial motion within the time permitted constitutes a failure to exercise the customary skills and diligence that a reasonably competent attorney would exhibit under similar circumstances and is a dereliction of an attorney's obligation to provide his client with the type of performance required by the Sixth Amendment.

*Ken*, ¶ 29, 267 P.3d at 575 (emphasis added).

[¶109] We found prejudice in *Ken* because, in ruling on the defendant's Rule 21 motion, the trial court found that it would have granted the motion for a new trial had it been timely filed. *Ken*, ¶ 31, 267 P.3d at 575. In Mr. Byerly's case, we do not have an untimely filing of a new trial motion, and the district court gave no indication in its Rule 21 ruling that it would have granted such a motion.

[¶110] Mr. Byerly's argument does not otherwise support his ineffectiveness claim. He does not simply argue the weight of the evidence. He also intertwines argument about additional claimed deficiencies in trial counsel's performance. For example, he suggests counsel was deficient for failing to object to the evidence in support of conviction, conduct proper cross-examination, limit or restrict evidence as improper expert testimony, and for

failing to recognize disconnects in evidence and failing to pin down where certain offenses occurred. All of these arguments are unsupported by any type of ineffectiveness analysis or citation to authority, and with only limited citation to the record as opposed to improper citation to his Rule 21 filings. We are unwilling to wade through the confusion created by this approach and the failure to properly structure the argument for our resolution. *See Bohling v. State*, 2017 WY 7, ¶ 45, 388 P.3d 502, 513 (Wyo. 2017) ("We decline to consider this issue. It is vague and undefined and, to the extent we can decipher the argument, it is not supported by any cogent argument or authority.") (quoting *Willey v. Willey*, 2016 WY 116, ¶ 30, 385 P.3d 290, 299 (Wyo. 2016)). We therefore reject Mr. Byerly's claim that trial counsel was ineffective in failing to move for a new trial.

## V. Joinder of Claims for Trial

[¶111] Mr. Byerly contends that the district court erred in joining Counts 11 and 12 with the earlier charges for trial. Because he did not object to the State's motion to join or to the court's order joining the charges for trial, he has waived appellate review of the order, and we do not consider the claim. *See Rodriguez v. State*, 2019 WY 25, ¶ 27, 435 P.3d 399, 407 (Wyo. 2019) (citing *Cox v. State*, 964 P.2d 1235, 1238 (Wyo. 1998)) (appeal waived by failure to file pretrial motion to sever offenses).

## VI. Denial of *Daubert* Hearing

[¶112] Mr. Byerly contends that the district court erred in denying his request for a *Daubert* hearing on the State's domestic violence expert. In support of this argument, he cites only to the *Daubert* two-part test for admissibility of expert testimony and our adoption of that approach. He otherwise offers no legal analysis of his claim with proper citation to the record. We therefore do not consider his argument. *Osban*, ¶ 7 n.2, 439 P.3d at 741 n.2 ("An appellant is required to present this court with relevant authority and cogent argument. It is not enough to identify a potential issue with the expectation that this court will flesh out the matter from there. The appellant, at a minimum, must attempt to relate the rule of law he depends upon to the facts of his case.").

## VII. Cumulative Error

[¶113] Mr. Byerly does not support his cumulative error argument with cogent argument. In any event, we found only one trial error in the single incident of prosecutorial misconduct, and no prejudice from the comment. We therefore have no need to undertake a cumulative error analysis.

[¶114] Affirmed.

**BOOMGAARDEN, Justice**, specially concurring, in which **KAUTZ, Justice**, joins.

[¶115] I agree with the majority that the convictions should be affirmed.  I write separately because I disagree with the majority's conclusion that the prosecutor violated a clear and unequivocal rule of law in a "clear and obvious, not merely arguable way" when he thanked the victim for her testimony on direct examination, stating:  "Ms. Pickerill, I know it's been a very long day and I know this is hard to go back through.  I appreciate your candor and your diligence."  This conclusion suggests that if a word—in this case "candor"—can be defined to include "honesty," then a prosecutor's use of that word constitutes vouching.  Our precedent requires that we consider a prosecutor's statement in context before concluding that it amounts to improper vouching.

[¶116] The majority focuses on the fact that the word "candor" may mean "honesty," apparently defining that word in the light most favorable to Mr. Byerly.  As the majority acknowledges, however, "candor" supports a broader definition.  Black's Law Dictionary defines "candor" as "[t]he quality of being open, honest, and sincere; frankness; outspokenness."  *Black's Law Dictionary* 255 (11th ed. 2019).  The Merriam Webster Dictionary defines it as "frankness, outspokenness."  *The Merriam Webster Dictionary* 70 (2005).  The word "frank" means "marked by free, forthright, and sincere expression."  *Id.* at 197.  And "outspoken" means "direct and open in speech or expression."  *Id.* at 353.  The online version of that same dictionary defines "candor" as "unreserved, honest, or sincere expression" and "freedom from prejudice or malice."  Merriam-Webster, https://www.merriam-webster.com/dictionary/candor (last visited Dec. 10, 2019).

[¶117] Prosecutors may not personally vouch for the credibility of witnesses because, among other reasons not relevant here, "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence."  *United States v. Young*, 470 U.S. 1, 18–19, 105 S.Ct. 1038, 1048, 84 L.Ed.2d 1 (1985) (citation omitted); *Williams v. State*, 2002 WY 136, ¶ 31, 54 P.3d 248, 256 (Wyo. 2002).  We should not deem this rule to be violated simply by virtue of the prosecutor's word choice.  Nor should we extend this rule to preclude a prosecutor's use of any word or phrase that might connote "honesty."  We must instead consider the meaning of any given word or phrase in the context in which it was used in order to determine whether a prosecutor "personally vouch[ed] for" the victim's credibility. *See, e.g.*, *Dixon v. State*, 2019 WY 37, ¶ 49, 438 P.3d 216, 234 (Wyo. 2019) ("Read in context, however, it is evident the statements do not invade the province of the jury."); *Larkins v. State*, 2018 WY 122, ¶ 95, 429 P.3d 28, 50 (Wyo. 2018) (citations omitted) ("When a defendant asserts that the State committed prosecutorial misconduct, we review the entire argument, and do not isolate discrete parts of the argument that may be taken out of context."); *King v. State*, 2018 WY 52, ¶ 11, 417 P.3d 657, 660 (Wyo. 2018) (citations omitted) ("Where the prosecutorial misconduct claim is one of improper argument, we are required to consider the challenged statement in the context of the entire closing argument."); *Buszkiewic v. State*, 2018 WY 100, ¶ 19, 424 P.3d 1272, 1278 (Wyo. 2018)

(citations omitted) ("[I]n evaluating whether a prosecutor actually expressed her personal beliefs or opinions to the jury, we have to consider the statements in context."); *Black v. State*, 2017 WY 135, ¶ 69, 405 P.3d 1045, 1065 (Wyo. 2017) ("Certainly, counsel should have chosen his words more carefully, but in context his statements were not personal attacks on defense counsel.").

[¶118] Certainly, as "a minister of justice," the prosecutor had no reason to thank this particular witness nor comment on the nature of her testimony. Wyoming Rule of Professional Conduct 3.8, Comment 1. His statement to Ms. Pickerill does not warrant a stamp of approval. After reviewing Ms. Pickerill's direct examination in context, however, I cannot conclude that the prosecutor clearly and obviously commented on Ms. Pickerill's truthfulness. Rather, in this single instance, after questioning the victim-witness, the prosecutor arguably thanked Ms. Pickerill, not for her honest testimony, but rather for her frank and outspoken testimony because she had just testified at length about some very personal and difficult matters concerning her relationship with Mr. Byerly.[8] In this context, the prosecutor's statement did not create an overt risk that the jury would trust the prosecutor's judgment rather than its own assessment of the evidence and the victim's credibility. Accordingly, it cannot be said that the prosecutor violated the vouching rule in any clear and obvious way.

---

[8] This interpretation is bolstered by the testimony of Mr. Byerly's trial counsel at the W.R.A.P. 21 hearing. When asked whether he objected to the prosecutor's statement, Mr. Byerly's trial counsel responded:

> I did not. And I don't believe that when I heard candor -- I see that you're trying to argue that has to go with truthfulness, that's the definition of candor. My impression was simply that he was thanking her for the details she provided. But I'll leave that to the judge to interpret.

Trial counsel heard the prosecutor's statement first-hand, in context.